This proceeding comes to this court upon exceptions by the prosecuting attorney of Summit county to a decision of the court of common pleas of Summit county, on application of the prosecuting attorney for permission to file a bill of exceptions in this court.
The judgment of the court of common pleas was entered in a felony case in that court sustaining a demurrer to an indictment, upon the ground that Paul F. Kassay was indicted under favor of Sections 13421-23 and 13421-24, General Code, and that said sections are unconstitutional.
The application was allowed, and thereafter a motion was filed to strike the bill of exceptions from the files, on the ground that the Supreme Court has no jurisdiction to hear and determine the question of law upon which the court of common pleas ruled, except as that question may be presented, first, in an error proceeding in the Court of Appeals, and thence on leave to file a bill of exceptions in this court.
The jurisdiction of this court in such matters was before this court for determination in the case of State v. Cameron,89 Ohio St. 214, 106 N.E. 28, and by the decision of a majority of this court the statute was held to be constitutional, and the jurisdiction of this court in such matters was approved. Subsequent to that adjudication the statute was amended, and as amended reads as follows:
"Section 13446-4. If the supreme court is of the opinion that the questions presented by such bill of exceptions should be decided, it shall allow the bill of exceptions to be filed and render a decision thereon; which decision shall not affect the judgment of the court of common pleas in said cause, NOR SHALL SAID JUDGMENT OF THE COURT OF COMMON PLEAS BE REVERSED, UNLESS THE JUDGMENT OF THE SUPREME COURT REVERSES THE JUDGMENT OF THE COURT OF COMMON PLEAS ON ITS RULING ON A MOTION TO QUASH A PLEA IN ABATEMENT, A *Page 179 
DEMURRER, OR A MOTION IN ARREST OF JUDGMENT; IN ALL OTHER CASES the decision of the supreme court shall determine the law to govern in a similar case."
The changes made in the section by the amendment are shown by that portion which has been printed in small capitals.
Before the amendment, the statute only provided for a determination of the law to govern in a similar case, and it was expressly provided that it should not affect the judgment of the court of common pleas. In the court of common pleas in the instant case the judgment had become a finality, and it was not sought to reverse or modify it by the exceptions filed by the prosecuting attorney. It was only sought to obtain the decision of this court declaring the law to govern similar cases. It must be conceded, as it has many times been declared by this court, that the Supreme Court of this state has its jurisdiction fully defined by the Constitution, and that the Legislature may not add to or take from that jurisdiction, except that it may provide revisory jurisdiction of the proceedings of administrative officers. That portion of the statute incorporated within the amendment is clearly invalid, because it does seek to confer upon the Supreme Court appellate jurisdiction directly from the court of common pleas. The judgment of the court of common pleas in ruling on a motion to quash, a plea in abatement, a demurrer, or a motion in arrest of judgment, can only be reviewed in an error proceeding filed in the Court of Appeals; and, later, on leave obtained, by this court. It has been recently declared in opinions published by this court that an error proceeding is a new action seeking the reversal of a judgment of the lower courts. It requires no citation of authority, or even argument, to show that any proceeding seeking the reversal of a judgment is the exercise of appellate jurisdiction, and that no error proceeding can *Page 180 
be filed in this court seeking the reversal of any judgment except a judgment of a court of appeals.
While we are not concerned in this proceeding with the amended portion of the statute, the discussion so far is deemed to be proper, because of the distinction to be drawn between the amended portion and that portion in existence prior to the amendment.
Assuming the amended portion to be unconstitutional, it must be inquired whether the new part can be separated from the old, and, if it can be separated, whether the old portion is in conflict with the Constitution as amended in 1912. We are of the opinion that the statute can be separated into two parts, and that, when separated, each part will be independent of the other, so that one part can be administered even though the other should be found invalid. There is a very definite test as to whether a statute may be held to be constitutional in part and unconstitutional in other parts, viz., whether the parts are so mutually connected with and dependent on each other, and each is such a consideration or compensation for the other as to make it probable that, if both could not be made effective, the Legislature would not have passed the other. In such event, if part is unconstitutional, any other provision which is thus dependent, conditional, or connected must also be held to be unconstitutional. There can be no such interdependence in this statute, because the part relating to the settlement of questions of law stood alone for more than sixty years and was administered in hundreds of instances. There is no basis for probability that the Legislature found any consideration or compensation in the amendment for the re-enactment of the original provision. They may therefore be considered as though the amendment had been incorporated into a separate section. The parent case on this question is Warren v. Mayor andAldermen of Charleston, 68 Mass. (2 Gray), 84, 99. That ease has been followed in a multitude of other cases by *Page 181 
the courts of last resort, including the United States Supreme Court. The principle has been approved by this court.
We therefore reach the question whether this court has the power to entertain the exceptions of a prosecuting attorney and to determine whether the ruling of the court of common pleas in the Kassay case was a sound rule to be applied in similar cases.
It has been definitely declared by this court, inState v. Cameron, supra, that this court has such power. In paragraph 3 of the syllabus of that case it is held that Section 13681, General Code, now Section 13446-1, General Code, was valid, "not as conferring jurisdiction but as prescribing a rule of procedure and practice as to certain appellate jurisdiction now conferred by the new constitution." Jurisdiction is defined as the power of a court to hear and decide a controversy between parties and to enter a judgment thereon. It follows that, if no judgment is entered which affects the parties to a controversy, there has been no exercise of judicial power, and therefore no exercise of jurisdiction. While this court is not concerned with the wisdom or unwisdom of legislation, it must be conceded that this statute has through its entire existence served a useful purpose. It would be unfortunate if the right to determine questions of law upon exceptions of a prosecuting attorney should be taken away. It was stated in the opinion in theCameron case that, in all cases where the defendant has not been placed in jeopardy, error might be prosecuted to the Court of Appeals from a judgment. No error could have been prosecuted, of course, from a judgment entered after the defendant was placed in jeopardy. Exceptions of a prosecuting attorney have, under the well-settled practice of the past, been filed in this court without regard to the question of jeopardy. Manifestly it could make no difference, since no judgment was to be affected. *Page 182 
We agree that error might have been prosecuted in this case, since it appears that Kassay had not yet been placed in jeopardy. The prosecutor did not follow that course, and he is subject to no criticism for having taken the other course. We are of the opinion that the Legislature had the power to impose upon this court the duty of declaring on questions of law to guide the lower courts in similar cases, even though it was not conferring upon this court judicial power. We are of the opinion that the Legislature could impose upon this court the duty of hearing exceptions of the prosecuting attorney,because it did not confer judicial power.
If the Legislature could not impose this duty upon this court, then, by parity of reasoning, it could not have imposed upon this court the duty of hearing election contest cases involving state officers. Neither could it authorize this court to alter or amend the rules and practice of probate courts, or to direct the attorney general in the enforcement of charitable trusts. Yet all these things are prescribed as the duties of this court, and they have been cheerfully performed. The Legislature has the power to fix the salaries of the judges of this court, and, by the same token, it must be held to have the power to prescribe reasonable duties, though the same may not be strictly classed as the exercise of judicial power.
Having found that the court has the power, we come to a consideration of the merit of the exceptions, and the question of the constitutionality of the syndicalism statutes. Those statutes are as follows:
Section "13421-23. That criminal syndicalism is the doctrine which advocates crime, sabotage, which is defined as the malicious injury or destruction of the property of another, violence, or unlawful methods of terrorism as a means of accomplishing industrial or political reform. The advocacy of such doctrine, *Page 183 
whether by word of mouth or writing, is a felony, punishable as is in this act provided."
Section "13421-24. Any person who by word of mouth or writing, advocates or teaches the duty, necessity or propriety of crime, sabotage, violence or unlawful methods of terrorism as a means of accomplishing industrial or political reform; or prints, publishes, edits, issues or knowingly circulates, sells, distributes or publicly displays any book, paper, document, or written matter in any form, containing or advocating, advising or teaching the doctrine that industrial or political reform should be brought about by crime, sabotage, violence or unlawful methods of terrorism; or openly, wilfully, and deliberately justifies, by word of mouth or writing, the commission or the attempt to commit crime, sabotage, violence or unlawful methods of terrorism with intent to exemplify, spread or advocate the propriety of the doctrines of criminal syndicalism; or organizes or helps to organize or become a member of, or voluntarily assembles with any society, group or assemblage of persons formed to teach or advocate the doctrines of criminal syndicalism; is guilty of a felony and punishable by imprisonment in the state penitentiary for not more than ten years, or by a fine of not more than five thousand dollars, or both."
The first of these sections defines criminal syndicalism. The second declares the advocacy of criminal syndicalism to be a felony. In the determination of the constitutionality of these statutes, there will be no occasion to refer to the indictment or to the bill of particulars, which were required to be furnished upon motion of the defendant. Whether or not the indictment was sufficient cannot affect the validity of the statutes themselves, or in any measure determine whether those statutes conflict with constitutional safeguards. It was decided in the trial court that the statutes were unconstitutional as in conflict with the First Amendment *Page 184 
to the Federal Constitution, and with Section 11 of the Ohio Bill of Rights.
It is not necessary to notice the Federal Constitution further than to state that it was decided by this court inBurke v. State, 104 Ohio St. 220, 135 N.E. 644: "The first ten amendments to the Constitution of the United States, constituting a bill of rights, were not designed as limits upon the state government, in reference to their own citizens, but exclusively as restrictions upon federal power."
This principle was reaffirmed by this court inStockum v. State, 106 Ohio St. 249, 139 N.E. 855. The principle has been declared by the United States Supreme Court in more than a score of opinions. It is necessary to refer to this matter, because the Federal Bill of Rights upon the subject of the freedom of speech and of the press differs from Section 11 of the Ohio Bill of Rights. The federal amendment is much more sweeping in its provisions. Section 11 of the Ohio Bill of Rights provides in part: "Every citizen may freely speak, write, and publish his sentiments on all subjects, being responsible for the abuse of the right; and no law shall be passed to restrain or abridge the liberty of speech, or of the press." It is apparent from this language that it does not guarantee the right freely and without restraint to express one's sentiments on every possible subject. It recognizes the responsibility for an abuse of the right. It indicates that there is a limit beyond which one may not go, and that, when that limit is exceeded, he enters the realm of abuse, and therefore the realm of responsibility.
The authority for the enactment of these statutes is found in the exercise of the police power, and a wide discretion and latitude are permitted the Legislature in determining whether its action is within the reasonable exercise of that power. This discretion, reasonably exercised, is a legislative function, and does not become justiciable unless the statute is found to have *Page 185 
no reasonable relation to the public welfare. This is only one of the tests of constitutionality. The other test is whether or not it violates clearly and beyond a reasonable doubt the express limitations of the Bill of Rights. This proposition is well expressed in Graves v. Minnesota, 272 U.S. 425,47 S.Ct., 122, 71 L.Ed., 331:
"The State is primarily the judge of regulations required in the interest of public safety and welfare, and its police statutes may only be declared unconstitutional where they are arbitrary or unreasonable attempts to exercise the authority vested in it in the public interest."
The state, in the exercise of its police power, may impose punishment upon those who make utterances inimical to the public welfare and which have a natural tendency to incite to crime or to disturb the public peace. Some of the states, in the enactment of criminal syndicalism legislation, have attempted to reach only those pernicious doctrines which tend to the overthrow of the government by force. Other statutes, notably in the state of California, are the same in substance as the Ohio statutes, and are aimed at any advocacy or justification of the employment of "violence or unlawful methods of terrorism as a means of accomplishing * * * industrial * * * or * * * political change." (Statutes, California, 1919, p. 281, Section 1.) Political reform is a very comprehensive expression, and might well include the design of overturning organized government. Even industrial reform is a proper subject-matter for protection of the people of the state, as is the preservation of the general welfare of the state by forbidding the teaching or advocacy of violence and unlawful methods of terrorism. Any government which cannot protect its people from violence and terrorism is a government in name only. The right to freely speak and publish one's sentiments is one thing, but the right to advocate and teach the *Page 186 
propriety of violence and terrorism as a means of compelling others to agree with one's sentiments is quite another. The right to advocate industrial and political reforms, and even the overthrow of an existing order by peaceful argument and persuasion, is guaranteed by the Bill of Rights; but to advocate the use of violence and terrorism is clearly an abuse of that right. The right of free speech is fundamental, but it is not absolute. Its exercise is subject to restriction by legislative authority; if restriction is required in order to protect the state and its people from serious injury. The United States Supreme Court has repeatedly declared that the necessity of a valid restriction does not exist unless the speech is reasonably designed or intended to produce imminent danger. But this question does not arise in the determination of the validity of the legislation. It can only arise in the trial of an indictment returned under and by virtue of the statute. The California act (Statutes, California, 1919, p. 281, Section 4) contains an unusual recital: "Inasmuch as this act concerns and is necessary to the immediate preservation of the public peace and safety, for the reason that at the present time large numbers of persons are going from place to place in this state advocating, teaching and practicing criminal syndicalism, this act shall take effect upon approval by the governor." It is also noteworthy that a number of the states have enacted statutes of a similar character. This fact must be taken as some evidence of an evil calling for a remedy. The Legislature is a proper judge of the need and of the propriety of the remedy. The question is therefore legislative, and only becomes justiciable when challenged on the ground that the statute has no reasonable relation to an existing evil.
The principles which are determinative of this case are not at this time matters of first impression. Interpretations of the guaranties of free speech in the various bills of rights of the states have been quite numerous, *Page 187 
and they are all in harmony with that which has heretofore been expressed in this opinion.
The Federal Bill of Rights, while not applicable to the states, is nevertheless the proper basis for interpretation of the Ohio Bill of Rights, because the language of the federal bill is stated without exception, while the Ohio bill makes a reservation of responsibility for abuse of the right. Even without this reservation, the Supreme Court of the United States, in a very large number of cases, has declared unequivocally that the right is not absolute, and that it is entirely within legislative authority to impose obligations both civil and criminal upon the abuse of the right. InRobertson v. Baldwin, 165 U.S. 275, at page 281,17 S.Ct., 326, 41 L.Ed., 715, it is stated: "In incorporating these principles into the fundamental law there was no intention of disregarding the exceptions, which continued to be recognized as if they had been formally expressed." In Patterson v.Colorado, ex rel. Atty. Gen., 205 U.S. 454, at page 462,27 S.Ct., 556, 51 L.Ed., 879, 10 Ann. Cas., 689, it is stated: "In the first place, the main purpose of such constitutional provisions is 'to prevent all such previous restraints upon publications as had been practiced by other governments,' and they do not prevent the subsequent punishment of such as may be deemed contrary to the public welfare."
The case of Schaefer v. United States, 251 U.S. 466,40 S.Ct., 259, 64 L.Ed., 360, involved the violation of the Espionage Act. That act was of course a war measure, but the principle must be the same. At page 477 of the opinion it is stated:
"But simple as the law is, perilous to the country as disobedience to it was, offenders developed and when it was exerted against them challenged it to decision as a violation of the right of free speech assured by the Constitution of the United States. A curious spectacle was presented: that great ordinance of government *Page 188 
and orderly liberty was invoked to justify the activities of anarchy or of the enemies of the United States, and by a strange perversion of its precepts it was adduced against itself."
In Frohwerk v. United States, 249 U.S. 204, at page 206,39 S.Ct., 249, 63 L.Ed., 561, it is stated: "The First Amendment while prohibiting legislation against free speech as such cannot have been, and obviously was not, intended to give immunity for every possible use of language."
In reviewing the conviction of John Most on a charge of seditious publication, the Court of Appeals of New York, inPeople v. Most, 171 N.Y. 423, 64 N.E. 175, 58 L.R.A., 509, was interpreting a statute under authority of a Constitution in identical language with the Bill of Rights of Ohio:
"While the right to publish is thus sanctioned and secured, the abuse of that right is excepted from the protection of the constitution, and authority to provide for and punish such abuse is left to the legislature. The punishment of those who publish articles which tend to corrupt morals, induce crime or destroy organized society, is essential to the security of freedom and the stability of the state."
In State v. Holm, 139 Minn. 267, at page 275, 166 N.W. 181, L.R.A., 1918C, 304, it is stated:
"These constitutional provisions preserve the right to speak and to publish without previously submitting for official approval the matter to be spoken or published, but do not grant immunity to those who abuse this privilege, nor prevent the state from making it a penal offense to publish or advocate matters or measures inimical to the public welfare."
Similar utterances are found in State v. Hennessy, 114 Wn. 351,359, 195 P. 211; State v. Boyd, 86 N.J. Law, 75, 79,91 A. 586; State v. McKee, 73 Conn. 18, 27,46 A. 409, 49 L.R.A., 542, 84 Am. St. Rep., 124; State v. Fox,71 Wn. 185, 127 P. 1111, affirmed by *Page 189 
the United States Supreme Court in Fox v. State of Washinigton,236 U.S. 273, 276, 35 S.Ct., 383, 59 L. Ed., 573.
More recently the United States Supreme Court has reaffirmed these principles in Gitlow v. People of New York,268 U.S. 652, 669, 45 S.Ct., 625, 69 L.Ed., 1138. From the opinion of Mr. Justice Sanford in that case we quote:
"A single revolutionary spark may kindle a fire that, smouldering for a time, may burst into a sweeping and destructive conflagration. It cannot be said that the State is acting arbitrarily or unreasonably when in the exercise of its judgment as to the measures necessary to protect the public peace and safety, it seeks to extinguish the spark without waiting until it has enkindled the flame or blazed into the conflagration. It cannot reasonably be required to defer the adoption of measures for its own peace and safety until the revolutionary utterances lead to actual disturbances of the public peace or imminent and immediate danger of its own destruction; but it may, in the exercise of its judgment, suppress the threatened danger in its incipiency."
This citation of the authority of numerous cases might be multiplied many times. In Story on the Constitution (5th Ed.), volume 2, Sections 1880 and 1881, the author discusses at length the guaranty of freedom of speech and the reasons which impelled the forefathers to protect our people in the right of free expression of their sentiments on all subjects. It is there pointed out, as has later been pointed out inPatterson v. Colorado, supra, that it was the purpose of those provisions to prevent all such "previous restraints" upon freedom of speech and publication as had been practiced by the governments of the Old World. It is then pointed out in Section 1884 that there is a good deal of loose reasoning on this subject, and the author then proceeds to declare the sound conclusion: *Page 190 
"But to punish any dangerous or offensive writings, which, when published, shall, on a fair and impartial trial, be adjudged of a pernicious tendency, is necessary for the preservation of peace and good order, of government and religion — the only solid foundations of civil liberty."
If it be said that those who were leaders of the revolutionary movement of 1776 and those who promoted the Declaration of Independence could have been punished under such a statute as we have under consideration, it must be conceded that this is true. It is not, however, the statement of a new proposition. The fathers of the revolution were undoubtedly guilty of treason against the British government, and, if the revolution had failed, doubtless could have been punished as traitors. Unsuccessful revolutionists are traitors, while successful revolutionists become patriots of the new order.
Many cases have been decided in other jurisdictions in which there were prosecutions under criminal syndicalism statutes and where reviewing courts reversed convictions on the ground that there was, in fact, no advocacy of crime, violence, or other unlawful acts as a means of effecting reforms. InFiske v. Kansas, 274 U.S. 380, 47 S.Ct., 655, 71 L.Ed., 1108, it is said in the opening statement of the opinion: "The only substantial federal question presented to and decided by the state court, and which may therefore be re-examined by this Court, is whether the Syndicalism Act as applied in this case
is repugnant to the due process clause of the Fourteenth Amendment."
In Stromberg v. California, 283 U.S. 359, 51 S.Ct., 532,75 L.Ed., 1117, 73 A. L. R., 1484, the opinion of Chief Justice Hughes, at page 368, states:
"There is no question but that the State may thus provide for the punishment of those who indulge in utterances which incite to violence and crime and threaten the overthrow of organized government by *Page 191 
unlawful means. There is no constitutional immunity for such conduct abhorrent to our institutions. Gitlow v. New York,supra; Whitney v. California, supra [274 U.S. 357,47 S.Ct., 641, 71 L.Ed., 1095]. We have no reason to doubt the validity of the second and third clauses of the statute as construed by the state court to relate to such incitements to violence."
These cases are therefore not contrary to the conclusions we have reached, but are decided in harmony therewith, because those decisions clearly upheld the constitutionality of such statutes. The reversal of the conviction in each case is because the indictment and the facts did not make a case under the statutes.
To assert that this statute is unconstitutional is to assert that those who advocate and teach the necessity and propriety of the employment of violence and terrorism in an effort to overturn an existing political order may go their length unchallenged, and that they are even under the protection of the Bill of Rights and beyond legislative and judicial processes. Such an assertion does violence to the genius of our institutions. Our forefathers, when they established this experiment in democracy, made ample provisions for changing our present form of government and establishing a new political system by constitutional processes. The various statutes on criminal syndicalism have been enacted since the conclusion of the World War. Criminal syndicalism is the overhang of that conflict. These statutes are designed to punish those of communistic habits of thought who prefer force to reason. Those statutes do not seek to punish academic and harmless discussion of the advantages of political and industrial reforms. They only seek to prevent the use of force, violence, and terrorism with their concomitant destruction of life and property as a means of promoting proposed reforms rather than an appeal to reason.
This entire discussion is based solely upon a consideration of the statute and the determination of its *Page 192 
validity as measured by the police power and the Bill of Rights. It would be wholly improper to discuss it from the standpoint of the indictment returned against Kassay or the bill of particulars which was filed in support of that indictment. Whether or not the indictment is sufficient to charge an offense under the statute, and whether or not the statement of facts disclosed by the bill of particulars and such other evidence as might be adduced would justify a conviction, are matters which we may not properly consider in determining the sole question of the constitutionality of the statute itself.
Upon the reasons herein stated, and upon the authorities cited and quoted, we conclude that the statute is a constitutional exercise of legislative power.
The exceptions will be sustained.
Exceptions sustained.
STEPHENSON, J., concurs.
JONES, MATTHIAS and DAY, JJ., dissent from proposition 3 of the syllabus, but concur in proposition 4 of the syllabus and in sustaining the exceptions.
ALLEN and KINKADE, JJ., dissent from sustaining the exceptions.