OPINIONS OF THE SUPREME COURT OF OHIO
     The full texts of the opinions of the Supreme Court of
Ohio are being transmitted electronically beginning May 27,
1992, pursuant to a pilot project implemented by Chief Justice
Thomas J. Moyer.
     Please call any errors to the attention of the Reporter's
Office of the Supreme Court of Ohio.  Attention:  Walter S.
Kobalka, Reporter, or Deborah J. Barrett, Administrative
Assistant.  Tel.:  (614) 466-4961; in Ohio 1-800-826-9010.
Your comments on this pilot project are also welcome.
     NOTE:  Corrections may be made by the Supreme Court to the
full texts of the opinions after they have been released
electronically to the public.  The reader is therefore advised
to check the bound volumes of Ohio St.3d published by West
Publishing Company for the final versions of these opinions.
The advance sheets to Ohio St.3d will also contain the volume
and page numbers where the opinions will be found in the bound
volumes of the Ohio Official Reports.


Eastwood Mall, Inc. et al., Appellees, v. Slanco, Appellant.
[Cite as Eastwood Mall, Inc. v. Slanco (1994),      Ohio
St.3d     .]
Constitutional law -- Injunction prohibiting "picketing,
     patrolling, handbilling, soliciting, or engaging in any
     other similar activities" on privately owned shopping
     center property not a violation of Section 11, Article I
     of the Ohio Constitution.
An injunction prohibiting "picketing, patrolling, handbilling,
     soliciting, or engaging in any other similar activities"
     on the property of a privately owned shopping center is
     not an unconstitutional prior restraint on speech in
     violation of Section 11, Article I of the Ohio
     Constitution.
     (No. 91-2200 -- Submitted October 12, 1993 -- Decided
February 9, 1994.)
     Appeal from the Court of Appeals for Trumbull County, No.
90-T-4433.
     Plaintiffs-appellees, Eastwood Mall, Inc. and Great East
Mall, Inc., commenced an action against appellant, Michael
Slanco, for injunctive relief against his repeated and
continuing trespass on their properties.  The appellees are
private owners of two adjacent shopping centers known as
Eastwood Mall and Great East Plaza, in Niles, Ohio.  Appellant
Slanco repeatedly engaged in picketing and handbilling on
appellees' properties, which appellees claimed created
congestion and an increased amount of litter.  Appellant often
wore a sandwich board bearing the message, "Eating at
McDonald's is hazardous to your health," and similar messages.
At various times, other persons joined appellant in these
activities.  Many people complained about the activities of
appellant.
     Appellees enforce a nondiscriminatory policy against all
handbilling, picketing, soliciting, and similar activities
without their permission on their properties.  Appellees
requested appellant to leave their properties but he refused to
do so.  The Niles police refused to enforce the criminal
statute against appellant.

After a three-day trial, the trial court granted the injunction to enjoin appellant from handbilling, picketing, soliciting, or engaging in similar activities on appellees' properties.  The court of appeals unanimously affirmed the trial court's judgment.

This matter is now before this court upon an allowance of a motion to certify the record.

David A. Fantauzzi, for appellees.

Kevin F. O'Neill and Staughton Lynd, for appellant.

Ronald G. Galip and Edward J. Sack, urging affirmance for amici curiae, International Council of of Shopping Centers, Inc., Edward J. DeBartolo Corporation, Forest City Enterprises, Inc., Glimcher Company, and Richards & David Jacobs Group, Inc.

Green, Haines, Sgambati, Murphy & Macala Co., L.P.A., Anthony P. Sgambati II and Barry Laine, urging reversal for amicus curiae, United Food and Commercial Workers Union, Ohio State Council, AFL-CIO.

Francis E. Sweeney, Sr., J.   The issue before this court is whether an injunction prohibiting "picketing, patrolling, handbilling, soliciting, or engaging in any other similar activities" on the property of a privately owned shopping center is an unconstitutional prior restraint on speech in violation of Section 11, Article I of the Ohio Constitution. For the following reasons, we find that it does not violate the Ohio Constitution, and, accordingly, affirm the judgment of the court of appeals.

The law is well settled that there is no right under the First Amendment to the United States Constitution for any person to use a privately owned shopping center as a forum to communicate on any subject without the permission of the property owner.  Hudgens v. NLRB (1976), 424 U.S. 507, 96 S.Ct. 1029, 47 L.Ed.2d 196; Lloyd Corp. v. Tanner (1972), 407 U.S. 551, 92 S.Ct. 2219, 33 L.Ed.2d 131.

A state may adopt greater protections for free speech on private property than the First Amendment does, so long as those broader protections do not conflict with the private property owner's constitutional rights under the First, Fifth and Fourteenth Amendments to the United States Constitution. Pruneyand Shopping Ctr. v. Robins (1980), 447 U.S. 74, 100 S.Ct. 2035, 64 L.Ed.2d 741.  Appellant argues that Section 11, Article I of the Ohio Constitution should be interpreted to prohibit a privately owned shopping center from restricting free speech, because while both provisions contain a clause stating that no law shall be passed to restrain or abridge the liberty of speech, or of the press, only Section 11, Article I begins with the clause:  "Every citizen may freely speak, write, and publish his sentiments on all subjects, being responsible for the abuse of the right."  Appellant claims that this section prohibits a private party as well as a government from restraining the right of any citizen to speak freely.

However, this court has previously concluded that the free speech guarantees accorded by the Ohio Constitution are no broader than the First Amendment, and that the First Amendment is the proper basis for interpretation of Section 11, Article I of the Ohio Constitution.  State ex rel. Rear Door Bookstore v.

Tenth Dist. Court of Appeals (1992), 63 Ohio St.3d 354, 362-363, 588 N.E.2d 116, 123; Zacchini v. Scripps-Howard Broadcasting Co. (1978), 54 Ohio St.2d 286, 288, 8 O.O.3d 265, 266, 376 N.E.2d 582, 583; State v. Kassay (1932), 126 Ohio St. 177, 187, 184 N.E. 521, 525.  Furthermore, while Section 11 has an additional clause not found in the First Amendment, the plain language of this section, when read in its entirety, bans only the passing of a law that would restrain or abridge the liberty of speech.  When the First Amendment does not protect speech that infringes on private property rights, Section 11 does not protect that speech either.  Zacchini v. Scripps-Howard Broadcasting Co., 54 Ohio St.2d at 288, 8 O.O.3d at 266, 376 N.E.2d at 583.  Thus, under the facts of this case, we find that Section 11, Article I of the Ohio Constitution is no broader than the First Amendment.

This conclusion was reached by several appellate courts in Ohio which have also read Section 11 as prohibiting only state action that restricts free speech.  These courts have held that Section 11 does not prevent a private property owner from excluding an unwanted speaker from its property.  Cleveland v. Sundermeier (1989), 48 Ohio App.3d 204, 207, 549 N.E.2d 561, 564; Columbus v. Kasper (Dec. 23, 1987), Franklin App. No. 87AP-508, unreported, 1987 WL 31290; Akron v. Wendell (1990), 70 Ohio App.3d 35, 590 N.E.2d 380.  Moreover, this conclusion is consistent with the majority of states whose courts of review have considered this question and have construed the free-speech provisions of their state constitutions to prohibit only state action.  Many of these states' constitutional provisions are nearly identical to Section 11, Article I of the Ohio Constitution.  These state courts have concluded that a privately owned shopping center may exclude unwanted speech from its property.[1]

In addition, we have held that:  "'The right to contract, the right to do business and the right to labor freely and without restraint are all constitutional rights equally sacred, and the privilege of free speech cannot be used to the exclusion of other constitutional rights nor as an excuse for unlawful activities with another's business * * *.'"  Crosby v. Rath (1940), 136 Ohio St. 352, 355-356, 16 O.O. 496, 497, 25 N.E.2d 934, 935.  "'The power to exclude has traditionally been considered one of the most treasured strands in an owner's bundle of property rights."  Bresnick v. Beulah Park Ltd. Partnership (1993), 67 Ohio St.3d 302, 303, 617 N.E.2d 1096, 1097 (citing Loretto v. Teleprompter Manhattan CATV Corp. [1982], 458 U.S. 419, 435, 102 S.Ct. 3164, 3176, 73 L.Ed.2d 868, 882).

Based on the above, we conclude that an injunction prohibiting "picketing, patrolling, handbilling, soliciting, or engaging in any other similar activities" on the property of a privately owned shopping center is not an unconstitutional prior restraint on speech in violation of Section 11, Article I of the Ohio Constitution.

Appellant also argues that the particular injunction issued in this case is overbroad.  This argument has merit.  The injunction prohibits, in part:  "Picketing, patrolling, handbilling, soliciting, or engaging in any other similar activities to communicate or demonstrate on any subject on the

private property of Eastwood Mall, Inc. or Great East Mall, Inc. * * *." (Emphasis added.) This injunction can be read to prohibit appellant from "communicating" on any subject without written permission from appellees. Thus, appellant could conceivably be found in violation of the injunction even if he were to encounter a friend on appellees' properties and strike up a conversation on politics, or any subject.

In Lloyd Corp. v. Whiffen (1989), 307 Ore. 674, 685, 773 P.2d 1294, 1300, the Oregon Supreme Court, finding an injunction to be overbroad, stated that a shopping center may not open its property to customers and then "forbid some or all of these visitors from discussing politics while window shopping or sharing a meal." The court held: "Equity simply will not spread a complete blanket over all political activity. People can and do peaceably and unobtrusively talk politics at the [Shopping] Center without creating a need for the extraordinary remedy of an injunction forbidding people engaged in this type of political activity from even venturing onto the property. The trial court went too far in issuing an injunction providing that 'defendants are hereby restrained and enjoined from entering upon plaintiff's property to exercise their expressions of opinion.'" Id. at 686, 773 P.2d at 1301.

Likewise, the injunction in the present case goes too far in prohibiting appellant from "communicat[ing]" on "any subject" on the private properties of appellees. Equity requires that an injunction should be narrowly tailored to prohibit only the complained of activities. Therefore, we hereby modify the injunction order by deleting the words "communicate or."

Judgment affirmed<br>and injunction modified.

Moyer, C.J., A.W. Sweeney, Resnick and Pfeifer, JJ., concur.

Wright, J., dissents.

Douglas, J., not participating.


Footnote
1. Charleston Joint Venture v. McPherson (S.C.1992), 417 S.E.2d 544; Citizens for Ethical Govt., Inc. v. Gwinnet Place Assoc., L.P. (1990), 260 Ga. 245, 392 S.E.2d 8; Southcenter Joint Venture v. Natl. Democratic Policy Commt. (1989), 113 Wash.2d 413, 780 P.2d 1282; Fiesta Mall Venture v. Mecham Recall Comm. (App.1989), 159 Ariz. 371, 767 P.2d 719, review denied, (Feb. 7, 1989); Jacobs v. Major (1987), 139 Wis.2d 492, 407 N.W.2d 832; Western Pa. Socialist Workers 1982 Campaign v. Connecticut Gen. Life Ins. Co. (1986), 512 Pa. 23, 515 A.2d 1331; SHAD Alliance v. Smith Haven Mall (1985), 66 N.Y.2d 496, 498 N.Y.S.2d 99, 488 N.E.2d 1211; Woodland v. Michigan Citizens Lobby (1985), 423 Mich. 188, 378 N.W.2d 337, rehearing denied (1986), 424 Mich. 1204; Cologne v. Westfarms Assn. (1984), 192 Conn. 48, 469 A.2d 1201; State v. Felmet (1981), 302 N.C. 173, 273 S.E.2d 708.

Wright, J., dissenting. It seems to me this court has taken one step forward but two steps backward in recent cases involving interpretation of the Ohio Constitution. The step forward occurred in Arnold v. Cleveland (1993), 67 Ohio St.3d 35, 616 N.E.2d 163, when we recognized the independent force of

the Ohio Constitution.  However, in less than one year, this court took a substantial step backwards in State v. Wyant (1994), 68 Ohio St.3d    ,    N.E.2d   , when this court failed even to address the "independent force" of the Ohio Constitution as applied to the constitutionality of R.C. 2927.12 (the ethnic intimidation statute).  Unhappily, a second step to the rear occurs today.  In the present case, Section 11, Article I of the Ohio Constitution loses much of its independent force and appears as a mere shadow of the First Amendment to the United States Constitution.  Because I support the view that "the Ohio Constitution is a document of independent force" (Arnold at 42, 616 N.E.2d at 169) and believe that Section 11, Article I affords Ohio citizens greater civil liberties and protections than does the First Amendment, I must vigorously dissent.

I

The majority concludes that "while Section 11 has an additional clause not found in the First Amendment, the plain language of this section, when read in its entirety, bans only the passing of a law that would restrain or abridge the liberty of speech."  The majority makes this assertion without ever quoting Section 11, Article I in its entirety.  The reason for this omission is apparent when one actually reads the entire text of Section 11, Article I, which states:

"Every citizen may freely speak, write, and publish his sentiments on all subjects, being responsible for the abuse of the right; and no law shall be passed to restrain or abridge the liberty of speech or of the press."  (Emphasis added.)

If the word "therefore" appeared instead of the word "and," I might agree that Section 11, Article I "bans only the passing of a law that would restrain or abridge the liberty of speech."  But the word "therefore" does not appear and we are not permitted to substitute words or rewrite the Ohio Constitution.  We are permitted to construe only the words that actually appear.  And in construing such words we are obligated to follow certain rules of construction.  One of those rules is that we must give meaning to all the words which appear in the Constitution.  As we said in State ex rel. Carmean v. Bd. of Edn. (1960), 170 Ohio St. 415, 422, 11 O.O.2d 162, 166, 165 N.E.2d 918, 923:  "It is axiomatic in statutory construction that words are not inserted into an act without some purpose."

Nor may we give a construction which would render words superfluous.  "[W]ords in statutes should not be construed to be redundant, nor should any words be ignored."  E. Ohio Gas Co. v. Pub. Util. Comm. (1988), 39 Ohio St.3d 295, 299, 530 N.E.2d 875, 879.  Further, "[i]n the construction of a section of the constitution the whole section should be construed together, and effect given to every part and sentence." (Emphasis added.)  Froelich v. Cleveland (1919), 99 Ohio St. 376, 124 N.E. 212, paragraph one of the syllabus.

The first sentence of Section 11, Article I has two clauses, separated by a semicolon, the second of which starts with the word "and."  This construction denotes two separate and distinct thoughts.  Therefore, we must give meaning to both clauses.  The first clause which states that "[e]very citizen may freely speak, write, and publish his sentiments on all subjects, being responsible for the abuse of the right," must

mean something entirely different from the second clause, which prohibits passing laws which restrain or abridge the liberty of speech or of the press. A contrary interpretation would render the first clause meaningless as mere surplusage. I agree with the Sixth Appellate District Court of Appeals that the first clause is "a promise to affirmatively protect the right" of free speech. Ferner v. Toledo-Lucas Cty. Convention & Visitors Bur., Inc. (1992), 80 Ohio App.3d 842, 848, 610 N.E.2d 1158, 1162.

The question whether Section 11, Article I provides protections which are broader than those provided under the First Amendment to the United States Constitution is not as settled as would appear from the majority opinion. The opinions from this court cited by the majority are limited to the facts of those cases and are distinguishable from the present case. For example, in State ex rel. Rear Door Bookstore v. Tenth Dist. Court of Appeals (1992), 63 Ohio St.3d 354, 362, 588 N.E.2d 116, 123-124, we quite correctly declined to interpret Section 11, Article I more broadly than the First Amendment so as to extend protection to sexually explicit conduct. "We have no reluctance in declining to follow New York's dubious leadership to enlarge Ohio's constitutional protections to encompass the activities occurring within the Rear Door Bookstore." Rear Door Bookstore, supra, at 362, 588 N.E.2d at 124.

Appellant in the present case, unlike the appellants in Rear Door Bookstore, has cited ample authority for the proposition that the free-speech guarantees under the Ohio Constitution are indeed broader than those provided under the United States Constitution. The authorities include the text of Ohio's Constitution, the historical context in which the Ohio Constitution was written,2 standard rules of constitutional construction, opinions from other Ohio courts,3 other state supreme court decisions,4 and law review articles.5 Further, I am completely satisfied that the nature of the expressive conduct involved in this case is constitutionally different from the sexually explicit conduct involved in Rear Door Bookstore.

Nor does this court's ruling in Zacchini v. Scripps-Howard Broadcasting Co. (1978), 54 Ohio St.2d 286, 8 O.O.3d 265, 376 N.E.2d 582, stand for the proposition cited by the majority that "[w]hen the First Amendment does not protect speech that infringes on private property rights, Section 11 does not protect that speech either." The issue in Zacchini was whether "as a matter of Ohio Constitutional law, a television station is immunized from damages for an alleged infringement of the right of publicity which a performer has in his particular commercial activity." Id. at 287-288, 8 O.O.3d at 266, 376 N.E.2d at 583. The United States Supreme Court had previously ruled that the television station was not immunized under the First and Fourteenth Amendments. In Zacchini the court stated:

"A majority of this court discerns no compelling reason on the record before us to render a constitutional declaration beyond that which the majority of the United States Supreme Court announced in reviewing this cause. Furthermore, we perceive no justification upon this record to conclude that the pertinent effects of the First and Fourteenth Amendments to the

United States Constitution are significantly different from those of Section 11, Article I of the Constitution of Ohio." (Emphasis added.) Zacchini at 288, 8 O.O.3d at 266, 376 N.E.2d at 583.6 Zacchini simply does not stand for the broad proposition for which it is cited by the majority.

In essentially concluding that Section 11, Article I provides no broader rights than the First Amendment "under the facts of this case," the majority is undoubtedly influenced by the fact that at the present time the United States Supreme Court has from time to time taken a fairly broad view of the protections afforded by the First Amendment. However, it was not ever thus and there is no guarantee that it shall remain the case. After all, the United States Supreme Court has not been reluctant to retreat from the broad views announced in other areas of constitutional interpretation. In the area of criminal defense rights, for example, the court has engaged in a noticeable retrenching of its earlier decisions interpreting the Fourth Amendment. This retrenchment has been a major impetus for the development of the "new federalism" under which state supreme courts interpret their state constitutions more broadly than they interpret the United States Constitution.7

I am heartened by the fact that, although a majority of this court believes that under the particular facts of this case Slanco is not afforded any broader rights than those recognized by the United States Supreme Court under the First Amendment, it has not foreclosed the possibility that Section 11, Article I may afford broader rights under other circumstances.8 My sense of optimism is based on the premise that it is contrary to sound policy to find that Section 11, Article I and the First Amendment are coextensive in all cases. Such a broad holding would adopt the "lock-step" approach to interpretation of state constitutions. Under this approach, state supreme courts would interpret their respective state constitutions precisely as the United States Supreme Court interprets the United States Constitution without engaging in any independent analysis of the state constitution. State courts that follow this approach "live with the threat that the Supreme Court, by interpreting the federal Constitution, may later reverse or undermine the state court's ruling on its own state constitution." Note, Privacy Rights in State Constitutions; Models for Illinois?, 1989 U.Ill.L.Rev. 215, 217. Furthermore, as Justice Brennan commented:

"[T]he decisions of the [United States Supreme] Court are not, and should not be, dispositive of questions regarding rights guaranteed by counterpart provisions of state law. Accordingly, such decisions are not mechanically applicable to state law issues, and state court judges and the members of the bar seriously err if they so treat them." Brennan, State Constitutions and the Protection of Individual Rights (1987), 90 Harv.L.Rev. 489, 502.

II

If, as I believe it to be the case, Section 11, Article I provides broader protection of free speech rights than is found in the First Amendment, then we are not bound to follow the United States Supreme Court's holdings that the First Amendment does not protect freedom of speech in a private forum. Hudgens

v. NLRB (1976), 424 U.S. 507, 96 S.Ct. 1029, 47 L.Ed.2d 196. In fact the United States Supreme Court has indicated that states are free to "fill the gap" left by the decision in Hudgens and may find state constitutional protection for the distribution of literature in privately owned shopping malls. Pruneyard Shopping Ctr. v. Robins (1980), 447 U.S. 74, 100 S.Ct. 2035, 64 L.Ed.2d 741. It remains to be determined whether the broader protections provided by Section 11, Article I allow Slanco to engage in free speech activities in appellees' privately-owned malls.

To resolve that issue we must first decide whether the rights contained in the "positive clause" in Section 11, Article I are enforceable not only against governmental or public bodies, but also under some circumstances against private entities as well. I am persuaded, as are the Supreme Courts of Massachusetts, Colorado, California and New Jersey, that state constitutional rights may be enforceable against private entities based on the extent of the public use of the private property. See Batchelder v. Allied Stores Internatl., Inc. (1983), 388 Mass. 83, 445 N.E.2d 590; Bock v. Westminster Mall Co. (Colo. 1991), 819 P.2d 55; Robins v. Pruneyard Shopping Ctr. (1979), 23 Cal.3d 899, 153 Cal. Rptr. 854, 592 P.2d 341; State v. Schmid (1980), 84 N.J. 535, 423 A.2d 615, appeal dismissed sub nom. Princeton Univ. v. Schmid (1982), 455 U.S. 100, 102 S.Ct. 867, 70 L.Ed.2d 855.

Without engaging in a lengthy analysis of the "state action" doctrine applicable under the United States Constitution,9 suffice it to say that there are several important factors which militate against the wholesale transfer of that doctrine to interpretations of the Ohio Constitution. First, there is a common misperception that written constitutions were intended solely to protect against governmental abuses of citizens' liberties. Such is not the case. Although protection against governmental abuse was a primary concern, it was not the sole concern.10 Second, textual differences between state constitutions and the United States Constitution (as present here) require different analyses and different standards. Third, "federal requirements concerning 'state action,' founded primarily in the language of the Fourteenth Amendment and in principles of federal-state relations, do not have the same force when applied to state-based constitutional rights." State v. Schmid, supra, at 559-560, 423 A.2d at 628. Because of these factors, I am advocating that we adopt a test independent of the federal standard to decide under which circumstances free-speech activities may occur on privately owned property.

Of course, the fact that Section 11, Article I may, under some circumstances, reach more than just government action does not mean that there is an unfettered right to speak while on private property. The owner of the property has certain expectations of privacy and the right to use his or her property. There is a need to balance these two constitutional rights which are in obvious tension with each other. I would therefore apply the balancing test set forth by the Supreme Court of New Jersey in State v. Schmid, supra, at 563, 423 A.2d at 630:

"This standard must take into account (1) the nature,

purposes, and primary use of such private property, generally its 'normal use,' (2) the extent and nature of the public's invitation to use that property, and (3) the purpose of the expressional activity undertaken upon such property in relation to both the private and public use of that property. This is a multi-faceted test which must be applied to ascertain whether in a given case owners of private property may be required to permit, subject to suitable restrictions, the reasonable exercise by individuals of the constitutional freedoms of speech and assembly."

To apply this test in the present case one must consider the specific characteristics of shopping malls. Indeed, one might ask how private are privately owned malls? From the very conception of such a project there is significant governmental involvement. At the very least, state and municipal zoning and development laws are implicated. Shopping malls are often built with tax abatement inducements and low interest loans guaranteed by government agencies.

These malls are usually open to the public seven days a week. The malls provide services and conveniences in addition to retail stores, such as banks, restaurants, hair salons, optometrists, movie theaters and large parking areas. The communal areas of shopping malls are often used for indoor walking space. Shopping malls frequently sponsor shows, exhibits and other performances. In short, they function as public-gathering centers. When one thinks about how a shopping mall actually functions, the enclosed common areas within the mall are comparable to the town square of yesteryear surrounded by downtown stores. One commentator has described shopping malls as the "'new downtowns,' in which members of the public may not only shop, but also stroll, sit, meet friends, and participate in community activities as they once did in downtown business districts." Note, Private Abridgment of Speech and the State Constitutions (1980), 90 Yale L.J. 165, 168.

By opening their shopping malls to the public, the owners of shopping malls have a reduced expectation of privacy. And citizens, because of the public nature of a mall, have a heightened expectation that they are permitted to engage in some forms of speech activities. Mall owners, however, also have reasonable expectations that the commercial purposes of their property will not be interfered with by those free-speech activities. A balancing test can resolve the conflict that will arise from these differing expectations.[11] The application of a balancing test, with reasonable restrictions as to time, manner and location, provides the owners of shopping malls with the right to use their property for commercial purposes while at the same time assuring citizens their right to engage in free speech activities.

Therefore, I would reverse the court of appeals and remand this cause to the trial court for application of the above-stated balancing test.

FOOTNOTE:

2 Appellant provides an interesting and detailed discussion of the historical context of the 1802 Ohio Constitution and the 1851 Ohio Constitution, the salient points being that Section 11, Article I (and its 1802 predecessor in

Section 6, Article VIII) are not based on the First Amendment. Ohio, as did other states, based its constitutional provisions on state constitutions that were in existence before the federal Constitution was drafted.  At that time the states were seen as the primary protectors of individual rights.  See my dissent in State v. Wyant (1994),      Ohio St.3d     ,      N.E.2d    .

3  Preterm Cleveland v. Voinovich (May 27, 1992), Franklin C.P. No. 92CVH01-528; F.A.R. Food, Inc. v. United Food & Commercial Workers, Local Union 880 (Aug. 18, 1989), Mahoning C.P. No. 88CV 342; Makro, Inc. v. United Food & Commercial Workers Union, Local Union 880 (1989), 64 Ohio App.3d 439, 581 N.E.2d 1143.

4  Batchelder v. Allied Stores Internatl., Inc. (1983), 388 Mass. 83, 445 N.E.2d 590; Robins v. Pruneyard Shopping Ctr. (1979), 23 Cal.3d 899, 153 Cal. Rptr. 854, 592 P.2d 341, affirmed sub. nom., Pruneyard Shopping Ctr. v. Robins (1980), 447 U.S. 74, 100 S.Ct. 2035, 64 L.Ed.2d 741; Bock v. Westminster Mall Co. (Colo. 1991), 819 P.2d 55; Right to Life Advocates v. Aaron Women's Clinic (Tex. App. 1987), 737 S.W.2d 564, certiorari denied (1988), 488 U.S. 824, 109 S.Ct. 71, 102 L.Ed.2d 47; State v. Schmid (1980), 84 N.J. 535, 423 A.2d 615.

5  Note, Privacy Rights in State Constitutions, 1989 U.Ill.L.Rev. 215; Utter & Pitler, Presenting a State Constitutional Argument: Comment on Theory and Technique (1987), 20 Ind.L.Rev. 635; Sedler, The State Constitutions and the Supplemental Protection of Individual Rights (1985), 16 U.Tol.L.Rev. 465; Brennan, State Constitutions and the Protection of Individual Rights (1987), 90 Harv.L.Rev. 489; Wright, In Praise of State Courts: Confessions of a Federal Judge (1984), 11 Hastings L.Q. 165; Developments in the Law, The Interpretation of State Constitutional Rights (1982), 95 Harv.L.Rev. 1324; Devlin, Constructing an Alternative to "State Action" as a Limit on State Constitutional Rights Guarantees: A Survey, Critique & Proposal (1990), 21 Rutgers L.J. 819.

6  Three members of the court concurred in the judgment to remand the case for trial, but indicated in two separate concurrences that the court should have addressed the standard to be applied under the Ohio Constitution.  The Zacchini decision has also been the subject of criticism from commentators as an example of this court's failure to use the Ohio Constitution as an independent source of constitutional rights.  Porter & Tarr, The New Judicial Federalism and The Ohio Supreme Court: Anatomy of a Failure (1984), 45 Ohio St. L.J. 143.

7  For example, this court declared in State v. Brown (1992), 63 Ohio St.3d 349, 588 N.E.2d 113, that the scope of an automobile search incident to a traffic violation is more limited under Section 14, Article I of the Ohio Constitution than under the Fourth Amendment.  Id. at 352, 588 N.E.2d at 115.  As noted in Arnold v. Cleveland, the "new federalism" has been the subject of law journal articles.  See Arnold, 67 Ohio St.3d 35, 41-42, 616 N.E.2d 163, 168-169, and footnote 5 supra.

8  I do not believe that the holding in this case affects the decision of the court of appeals for the Sixth Appellate District in Ferner v. Toledo-Lucas Cty. Convention & Visitors Bur., Inc. (1992), 80 Ohio App.3d 842, 848, 610 N.E.2d 1158,

1162, because the facts of the two cases are distinguishable. Ferner involved the solicitation of signatures on nominating petitions at a convention center. A county or municipal convention center, even if operated as a nonprofit corporation, has even more indicia of a public forum than a privately owned shopping mall. Further, the right to collect signatures for a nominating petition, or similarly, referendum or initiative petitions, implicates state constitutional rights in addition to the free-speech provisions of Section 11, Article I, such as Sections 1, 1a-c, Article II, Section 4, Article X, and Section 5, Article XVIII.

9 For such a discussion see State v. Schmid (1980), 84 N.J. 535, 423 A.2d 615.

10 See Devlin, Constructing an Alternative to "State Action" as a Limit on State Constitutional Rights Guarantees: A Survey, Critique & Proposal (1990), 21 Rutgers L.J. 819, 865-872.

11 Application of such a balancing test would not disturb the lower-court rulings cited by the majority which concern unwanted protestors at abortion clinics. There, the general public is not invited and there is an increased expectation of privacy by the patients of the clinics. Cleveland v. Sundermeier (1989), 48 Ohio App.3d 204, 207, 549 N.E.2d 561, 564; Akron v. Wendell (1990), 70 Ohio App.3d 35, 590 N.E.2d 380.