286

ZACCHINI, APPELLEE, v. SCRIPPS-HOWARD BROADCASTING CO., APPELLANT.

(No. 75-995—Decided May 24, 1978.)

Messrs. *Spangenberg, Shibley, Traci & Lancione* and Mr. *John C. Lancione,* for appellee.

Messrs. *Baker, Hostetler & Patterson,* Mr. *Ezra K. Bryan,* Mr. *Don H. Pace* and Mr. *Lawrence V. Lindberg,* for appellant.

*Per Curiam.* The legal dispute central to this cause arose when a television station owned by appellant, the Scripps-Howard Broadcasting Company, showed, as a part of its evening news program, a film clip of appellee, Hugo Zacchini, performing his human cannonball act at the Geauga County Fair. In *Zacchini* v. *Scripps-Howard Broadcasting Co.* (1976), 47 Ohio St. 2d 224, 351 N. E. 2d 454, this court reinstated the trial court's entry of a summary judgment for Scripps-Howard.

On June 28, 1977, the Supreme Court of the United States reversed the judgment of this court in *Zacchini* v. *Scripps-Howard Broadcasting Co., supra.*

The cause is now before this court on remand from the United States Supreme Court for further proceedings not inconsistent with its opinion.

In holding that the First and Fourteenth Amendments to the United States Constitution do not immunize appellant from damages for its alleged infringement of appellee's right of publicity, a five-member majority of the United States Supreme Court commented as follows:

"* * * Wherever the line in particular situations is

to be drawn between media reports that are protected and those that are not, we are quite sure that the First and Fourteenth Amendments do not immunize the media when they broadcast a performer's entire act without his consent. The Constitution no more prevents a State from requiring respondent to compensate petitioner for broadcasting his act on television than it would privilege respondent to film and broadcast a copyrighted dramatic work without liability to the copyright owner, * * * or to film and broadcast a prize fight, * * * or a baseball game, * * * where the promoters or the participants had other plans for publicizing the event. There are ample reasons for reaching this conclusion.

"The broadcast of a film of petitioner's entire act poses a substantial threat to the economic value of that performance. As the Ohio court recognized, this act is the product of petitioner's own talents and energy, the end result of much time, effort and expense. Much of its economic value lies in the 'right of exclusive control over the publicity given to his performance'; if the public can see the act for free on television, they will be less willing to pay to see it at the fair. [Footnote omitted.] The effect of a public broadcast of the performance is similar to preventing petitioner from charging an admission fee. * * *

"* * * *

"There is no doubt that entertainment, as well as news, enjoys First Amendment protection. It is also true that entertainment itself can be important news. *Time, Inc.,* v. *Hill, supra* [385 U. S. 374 (1967)]. But it is important to note that neither the public nor respondent will be deprived of petitioner's performance as long as his commercial stake in his act is appropriately recognized. Petitioner does not seek to enjoin the broadcast of this performance; he simply wants to be paid for it." 433 U. S. 562, 53 L. Ed. 2d 965, 975-76, 978.

The sole issue for this court to decide on remand is whether, as a matter of Ohio Constitutional law, a television station is immunized from damages for an alleged

infringement of the right of publicity which a performer has in his particular commercial activity.

Section 11 of Article I of the Ohio Constitution guarantees freedom of speech and of the press, and reads, in pertinent part, as follows:

"Every citizen may freely speak, write, and publish his sentiments on all subjects, being responsible for the abuse of the right; and no law shall be passed to restrain or abridge the liberty of speech, or of the press. * * *"

A majority of this court discerns no compelling reason on the record before us to render a constitutional declaration beyond that which the majority of the United States Supreme Court announced in reviewing this cause. Furthermore, we perceive no justification upon this record to conclude that the pertinent effects of the First and Fourteenth Amendments to the United States Constitution are significantly different from those of Section 11 of Article I of the Constitution of Ohio.

This cause is remanded for trial to determine whether appellant engaged in an actionable infringement of appellee's rights and so that damages, if any, may be assessed.

*Cause remanded.*

O'NEILL, C. J., HERBERT, P. BROWN and SWEENEY, JJ., concur.

CELEBREZZE, W. BROWN and LOCHER, JJ., concur in the judgment.

CELEBREZZE, J., concurring. I concur in the decision to remand this cause for trial for a determination of whether appellant infringed upon appellee's right of publicity so as to become liable therefor, and so that damages, if any, may be assessed. I write separately because the opinion of the majority does not directly address what it concedes to be the sole issue for this court to decide on remand, *viz.*, whether, as a matter of Ohio constitutional

law, a television station is immunized from damages for an alleged infringement of the right of publicity which a performer has in his particular commercial activity. In view of the incontestable fact that the United States Supreme Court lacked jurisdiction to interpret and apply the free speech provision of the Ohio Constitution, I believe it is necessary for this court to do so. Indeed, this court will be abdicating its role as the ultimate arbiter of Ohio law if it remands this cause without having performed an analysis of the state constitutional law which must be applied to the facts as they develop at trial.

The five member majority of the United States Supreme Court held that the First and Fourteenth Amendments to the United States Constitution do not immunize the media when they broadcast a performer's entire act without his consent. A majority of this court seems to conclude that the scope of the guarantees contained in Section 11, Article I of the Ohio Constitution is not "significantly different" than the scope of similar guarantees within the First Amendment to the United States Constitution. Implicit within this conclusion is the holding that, under Ohio constitutional law, the media is privileged to broadcast a performer's act, without his consent, so long as the "entire act" is not appropriated. If this be the true intention of the majority I must disagree, and offer instead the following observations.

Unlike the First Amendment to the United States Constitution, which is, on its face, an absolute guarantee of free speech and press, Section 11, Article I of the Ohio Constitution proclaims that "[e]very citizen may freely speak, write, and publish his sentiments on all subjects, *being responsible for the abuse of the right.*" (Emphasis added.) In my opinion the latter phrase expresses a caveat, and allows for an interpretation of Section 11, Article I of the Ohio Constitution which is more narrow than the high court's interpretation of the First Amendment, made applicable to the states through the Fourteenth Amendment.

290

Furthermore, in the course of defining a standard by which to ascertain possible liability under Ohio law I would prefer that the "performer's entire act" formula, utilized by a majority of the United States Supreme Court in their review of this cause, not be employed by Ohio courts. Such a formula fails to provide a sufficiently clear standard for resolution of this case and future similar cases and, in addition, is susceptible to easy circumvention, as where all but a second or two of a performer's act is appropriated by another. Therefore I suggest, as a substitute standard, that in that trial of this rather novel cause of action the court determine whether any salient, essential and nuclear portions of a performer's act have been appropriated. Under this standard a more equitable balance can be reached between two competing concerns, since the media will be less likely to threaten the economic value of any performance it chooses to report.

It must be acknowledged that one function of the media is to freely inform the public about newsworthy entertainment events. The other concurring opinion in this cause professes to abhor the prospect of press self-censorship but urges, nevertheless, that the media should respond in damages if it televises, broadcasts or otherwise appropriates *too much of* an entertainer's act. Certainly this quantitative standard imposes an added responsibility upon the news media, as does the qualitative standard proposed herein. It would seem that in order to reconcile the media's right to inform the public about newsworthy entertainment with the entertainer's right to enjoy the fruits of his own industry, some degree of restriction on freedom of the press is unavoidable. The only real distinction between the two proposed tests is that I would impose liability where the media appropriates these portions of an act which an audience would otherwise have paid to see, whereas my concurring brother has formulated a standard under which the media could avoid liability simply by excluding any portion of the appropriated act which it deems to be of lesser public interest.

It is my position that the entertainer has a legitimate, correlative right which is entitled to protection, that being the right to enjoy the fruits of his own industry, free from unjustified interference or appropriation. Therefore, while a privilege should obtain in favor of the media when it reports newsworthy events, the privilege should not be considered a license to broadcast or televise salient, essential and nuclear portions of an entertainer's act itself. That type of reportage interferes with the entertainer's control over the commercial display and exploitation of his personality, and may well amount to an infringement upon the entertainer's right of publicity.

LOCHER, J., concurs in the foregoing concurring opinion.

WILLIAM B. BROWN, J., concurring. The majority opinion asserts that "the sole issue for this court to decide on remand is whether, as a matter of Ohio Constitutional law, a television station is immunized from damages for an alleged infringement of the right of publicity * * *." Having set forth that issue, the opinion inexplicably concludes that there is "no compelling reason" to decide it. Because I believe that the majority opinion's failure to rule on the only legal question before it constitutes an abdication of judicial responsibility and a transparent attempt to avoid drawing the boundaries of a press privilege which should not be that difficult to delineate, I must concur in the judgment only.

### I.

On its route from Cuyahoga County trial court to the United States Supreme Court, the instant cause has received the attention of four courts, given rise to major pronouncements concerning state tort law and federal constitutional law, and kept counsel for both parties occupied for nearly five years.[1] It is now before this court on remand.

---

[1] Mr. Zacchini first filed his complaint in July 1973.

This court's earlier decision established that, absent a privilege, Hugo Zacchini has a cause of action against Scripps-Howard. The United States Supreme Court ruling established that, under federal constitutional law, Scripps-Howard is not privileged to film Zacchini's entire act. Therefore, the only legal issue which this court has before it is to determine what privileges Scripps-Howard may or may not have under state constitutional law. Furthermore, there is no reason why this court should not address that issue at this time, and there are many reasons why we should. The instant cause is not likely to become moot; the United States Supreme Court has already clarified federal law; and our remanding without ruling on press privilege is not likely to produce a complete record on appeal.[2] Moreover, we are the final arbiter of state constitutional law. Unless we now commit ourselves to determining the rights of the parties under that law, the trial court will be without guidance when it decides whether it has a case to try, and any determination it makes is likely to be reappealed to this court—probably at a waste of an additional three years time.[3] Finally, the constitutional law in question is not so complicated nor are the alternatives so generally undesirable that the majority is justified in avoiding the issue at all costs.

## II.

Section 11, Article I of the Ohio Constitution, guarantees freedom of speech and of the press. It provides, in pertinent part:

"Every citizen may freely speak, write, and publish his sentiments on all subjects, being responsible for the abuse of the right; and no law shall be passed to restrain or abridge the liberty of speech, or of the press. * * *"

The first question to be considered when press privi-

---

[2]Since press privilege bars a tort cause of action, if the trial court finds on remand that such a privilege exists, no record will be produced before the cause comes before this court again.

[3]Our former ruling on this cause was issued three years after the original complaint was filed.

lege is at issue is whether the subject which the press claims it is privileged to publicize is news. If it is news, then the court must ask whether the press privilege should be limited under given circumstances because the harm to the individual caused by *unrestricted* news reporting outweighs the benefits of such reporting to society.[4] Finally, if the court finds that the individual's rights require limitations on the press, it must also ask itself whether the limitations which it has formulated are the least restrictive necessary to protect the individual's rights.[5]

Although Hugo Zacchini's human cannonball act is entertainment, *it is also news* (see *Zacchini* v. *Scripps-Howard Broadcasting Co.* [1976], 47 Ohio St. 2d 224, 235; *Time, Inc.,* v. *Hill* [1967], 385 U. S. 374, 388; and, for tort law definitions of "entertainment" as news, see *Sweenek* v. *Pathe News* [E. D. N. Y. 1936], 16 F. Supp 746, 747, and Prosser on Torts [4 Ed.] 824, 825, Section 118, and the cases cited therein). Therefore, the privilege of the press to broadcast that news may be restricted *only* if Zacchini's rights as an individual outweigh society's interest in viewing the entire act as news. The interest threatened by the broadcast of an entertainer's entire act is his "right of publicity." *Zacchini, supra* (47 Ohio St. 2d 224), at page 231. That publicity right protects the public personality's "right to enjoy the fruits of his own industry" (*Palmer* v. *Schonhorn Enterprises, Inc.* [1967], 96 N. J. Super. 72, 79, 232 A. 2d 458, 462), by granting him, if he is a performer like Zacchini, "control over the publicity given to his performances." *Zacchini, supra,* at page 232. If television stations are privileged to broadcast an entertainer's entire act, as opposed to portions of it, they are likely to siphon-off the entertainer's paying audience

---

[4]This court has adopted such a balancing approach in the past when it has acknowledged that the press may be penalized by lawsuit (*Cincinnati Gazette Co.* v. *Timberlake* [1860], 10 Ohio St. 548), or restrained by judicial order (*State, ex rel. Beacon Journal Pub. Co.,* v. *Kainrad* [1976], 46 Ohio St. 2d 349).

[5]See *Beacon Journal, supra,* and *Time, Inc.,* v. *Hill* (1967), 385 U. S. 374.

and deny him the right to enjoy the fruits of his industry because his potential customers will have already viewed his act on the local news. Moreover, one who travels around the country performing a short novelty act like Zacchini's may find his act appropriated by news broadcasters, who owe him no compensation, far more frequently than by the film makers not associated with the press who are liable for invading his right of publicity. Since an entire-act privilege seriously threatens to destroy the right to enjoy the benefits of one's industry and frees from liability the class of appropriators who are most likely to pose that threat, it is clearly harmful to the individual.

It is possible, moreover, to protect Zacchini's publicity rights and restrict the press from broadcasting an entertainer's entire act without endangering the "unfettered interchange of ideas." *Roth* v. *United States* (1957), 354 U. S. 476, 484. One key to protecting both the entertainers' and the broadcasters' interest is to limit the quantity of that act which may be broadcast. Limiting the amount of an act which may be telecast with impugnity protects society's interest in a free press because the press should be able to determine how *much* of an act it has telecast, and, therefore, it should not be forced to censor itself in order to avoid lawsuits. *Smith* v. *California* (1959), 361 U. S. 147, 150-154.[6] In addition, if that quantity of an act which the

---

[6]Since the interest to be protected in a publicity claim like Zacchini's is the entertainer's right to enjoy the fruits of his industry by controlling the publicity given his act, *as a matter of tort law* the appropriation which would be significant would be the appropriation of those portions of the act which the audience pays to see. Appropriation of other portions of an act is not significant as a matter of tort law because such appropriation might actually attract customers and because, unless those appropriated portions of the act distort the entertainer's image in some way, there is no additional privacy interest to be protected. See Gordon, Right of Privacy in Name, Likeness, Personality and History (1960), 55 N. W. U. L. Rev. 553, 607. However, limiting privileged telecasts of an entertainer's act to something less than or other than the essence or money-making portions of a performance, while it makes sense as a matter of tort law, establishes a privilege with such indefinite boundaries that it is likely to result in press self-censorship.

press is privileged to broadcast is sufficiently large, the television media should not have to rely on "watered-down verbal reporting" when it reports the news. *Zacchini* v. *Scripps-Howard Broadcasting Co.* (1977), 433 U. S. 562, 53 L. Ed. 2d 965, 979.[7] Limiting the amount of an act which may be broadcast will also help protect entertainers' publicity rights. If only portions of short novelty acts like Zacchini's may be broadcast, performers in those acts will be placed on an equal footing with the majority of individuals whose acts or the athletic events in which they participate are too long to fit, in their entirety, into a television news format. Moreover, as the existence of previews attests, telecasts of the highlights of a performance are as likely to swell the performer's audiences as not.

The second key to protecting the interests of the press and the performer is to carefully define an act. If an act is defined as beginning only after an entertainer's on-stage *preparations* are completed and ending when his final bows begin, and if the press is privileged only to film less than all of that act, as a practical matter the press will usually find itself limited only when the need to protect the entertainer's publicity rights is greatest. (In most acts the performer is not likely to engage in lengthy on-stage preparations; but, in short novelty acts which are most likely to be appropriated in a television news broadcast, the performer may well include elaborate on-stage preparations in order to build suspense and give the audience a sense of viewing its money's worth.) Moreover, if an act is defined as beginning only after an entertainer's on-stage

---

[7] In *Zacchini* v. *Scripps-Howard Broadcasting Co.* (1977), 433 U. S. 562, 53 L. Ed. 2d 965, 972, the United States Supreme Court pointed out that the fact of Zacchini's performance can be reported by the press as a newsworthy item. The dissenters argued, at page 979, that "watered-down verbal reporting" in a television news program would make the public the loser. It seems to me that the publication of the news in the most effective manner available should be part of any press privilege, but that, in considering whether the public's right to information outweighs the harm to the individual, the question whether the news media has an alternative form of publishing the news should be considered.

preparations are completed and ending when his final bows begin, the press will not be able to circumvent the limitations on its broadcasting privilege merely by excluding a bow or the removal of a cape. Finally, a press privileged to broadcast something less than those portions of an act which occur after the performer's on-stage preparations have ended and before his bows begin will not be likely to deny the performer in a short novelty act like Zacchini's the fruits of his industry because the portion of the performer's activities which the press will be privileged to telecast should not be sufficiently complete to afford more than a movie-preview highlight of the act. (Since the broadcast of anything less than all of Zacchini's act of flying out of the cannon and into the net must exclude either the beginning or the middle or the end of the cannonball sequence, its telecast should not sate potential customers' curiosity.)

I propose, therefore, that, as a matter of Ohio constitutional law, a television station should be privileged to broadcast less than an entertainer's entire act—that is, less than all of a performer's activities occurring after his on-stage preparations have ended and before his final bows begin—unless the television station actually intended to injure the entertainer or to appropriate the benefit of the publicity for some non-privileged use (*Zacchini, supra,* at page 235).[9]

Therefore, I do not agree with the majority that there is no alternative to remanding the instant cause to the trial court without providing state constitutional guidelines, and I must concur in the judgment only.

---

[9] Under this restricted press privilege the press is free to broadcast all of the entertainer's activities which are not defined as part of his act. Therefore, any of his on-stage preparations may be telecast.