[This opinion has been published in *Ohio Official Reports* at 85 Ohio St.3d 524.]

CITY OF CLEVELAND, APPELLEE, *v.* TRZEBUCKOWSKI, APPELLANT.

[Cite as *Cleveland v. Trzebuckowski*, 1999-Ohio-285.]

*Appellate procedure—Determining whether a judgment entry is a final appealable order when the clerk of court does not journalize the entry until after the thirty-day period has run as set forth in Sup.R. 7—Municipal corporations—Ordinances—Prosecutor's discriminatory enforcement of Cleveland Codified Ordinance 688.13 against privately owned, for-profit billiard rooms and not against city-owned, public recreation centers violates right to equal protection as guaranteed by the United States and Ohio Constitutions.*

(No. 96-2190—Submitted January 12, 1999—Decided June 2, 1999.)

APPEAL from the Court of Appeals for Cuyahoga County, No. 69478.

————————————

{¶ 1} On March 12, 1995, a Cleveland police officer issued five complaints against defendant-appellant, Stanley Trzebuckowski, for allowing a juvenile in a billiard room, a violation of Cleveland Codified Ordinance 688.13. According to the printout of the docket that this court received from the Cuyahoga County Court of Appeals, these complaints were received and filed with the Cleveland Municipal Court Clerk's Office on March 14, 1995. On June 7, 1995, defendant filed a motion to dismiss the charges on the grounds that the ordinance was unconstitutional. On June 22, 1995, the court completed a judgment entry form, stating that it was granting defendant's motion to dismiss. This judgment entry form was stamped "Judgment Entry Received for Journalization Sep 12 1995."

{¶ 2} On July 26, 1995, the municipal court submitted its finding of fact and conclusion of law, supporting its decision to grant the motion to dismiss on the grounds that the ordinance was unconstitutional (the date below the judge's

signature, in a handwriting different from that of the judge's signature, is June 23, 1995). The finding of fact and conclusion of law also is stamped "Judgment Entry Received for Journalization Sep 12 1995."

{¶ 3} On August 28, 1995, appellee, city of Cleveland, filed a notice of appeal in the Cuyahoga County Court of Appeals. On November 3, 1995, defendant filed a motion to dismiss the appeal, asserting that the city did not timely file its notice of appeal and therefore that the court of appeals had no subject-matter jurisdiction. The court of appeals' decision, released on August 15, 1996 and journalized on September 9, 1996,[1] apparently denied, without so stating, defendant's motion to dismiss. The court of appeals held the ordinance constitutional on the merits of the city's arguments, thus apparently assuming its own jurisdiction. The court of appeals accordingly reversed the decision of the trial court and entered judgment for the city.

{¶ 4} On September 9, 1996, the court of appeals directly addressed defendant's jurisdictional arguments in a journal entry denying his August 26, 1996 application for reconsideration. The court of appeals held that the date of journalization of the trial court's judgment entry started the "appeal clock" running, and thus the city's notice of appeal was *prematurely*, but timely, filed pursuant to App.R. 4(C).

---

1. The Eighth Appellate District delays journalization of its entries in order to allow the parties to have time to file a motion for reconsideration before having to file a notice of appeal in the Supreme Court. Rule 27 of the Local Rules of the Eighth Appellate Judicial District (Cuyahoga County) states:

"The initial release of a journal entry and opinion is an announcement of decision issued pursuant to App.R. 22(B) and 26(A). Within ten days after the date of an announcement of decision, any party to the appeal may file an application for reconsideration. App.R. 22(D) and 26(A). Pursuant to App.R. 22(E), this court will file the journal entry and opinion with the clerk of this court for journalization on the tenth day after the announcement of decision if a timely application for reconsideration is not filed. See also App.R. 14(A). If a timely application for reconsideration is filed, journalization will be deferred until this court disposes of the application for reconsideration. Pursuant to App.R. 22(E), a journal entry and opinion constitutes the entry of the judgment upon journalization. The time for filing a notice of appeal to the Supreme Court of Ohio runs from the date of the entry of judgment in this court. S.Ct.Prac.R. II, Section 2(A)."

**{¶ 5}** This cause is now before this court upon the allowance of a discretionary appeal.

_____

*George A. Pace, Jr.*, Cleveland Chief Prosecutor, and *Jay A. Cole*, Assistant City Prosecutor, for appellee.

*Kenneth A. Bossin* and *Robert J. Willis*, for appellant.

_____

**ALICE ROBIE RESNICK, J**.

**{¶ 6}** Before we reach the merits of this case, we must address the issue of whether a judgment entry is a final appealable order when the clerk of court does not journalize the entry until after the thirty-day period has run as set forth in Sup.R. 7.

I

**{¶ 7}** The Rules of Superintendence for the Courts of Ohio apply to "all courts of appeal, courts of common pleas, municipal courts, and county courts" in Ohio. Sup.R. 1(A). Sup.R. 7(A) states:

"The judgment entry specified in Civil Rule 58 and in Criminal Rule 32 shall be filed and journalized within thirty days of the verdict, decree, or decision. If the entry is not prepared and presented by counsel, it shall be prepared and filed by the court."

**{¶ 8}** In the case *sub judice*, the municipal court's judgment entry, which granted defendant's motion to dismiss and purported to terminate the case at the trial level, was prepared on June 22, 1995. The entry was not journalized by the clerk until September 12, 1995, a full eighty-two days later. The city filed its notice of appeal on August 28, 1995, sixty-seven days after the entry was prepared, and fifteen days *before* the entry was journalized.

**{¶ 9}** App.R. 4(A) requires that a party file the notice of appeal "within *thirty days* of the later of entry of the judgment or order appealed or, in a civil case,

service of the notice of judgment and its entry if service is not made on the party within the three day period in Rule 58(B) of the Ohio Rules of Civil Procedure." (Emphasis added.) In *State ex rel. Hughes v. Celeste* (1993), 67 Ohio St.3d 429, 430, 619 N.E.2d 412, 414, we set forth the test for a final appealable order:

"Under R.C. 2505.02, an order is final and appealable if it satisfies each of these three criteria: (1) it affects a substantial right; (2) it in effect determines the action; and (3) it prevents a judgment. *Bellaire City Schools Bd. of Edn. v. Paxton* (1979), 59 Ohio St.2d 65, 13 O.O.3d 58, 391 N.E.2d 1021.

"A 'substantial right' is a legal right enforced and protected by law. *Noble v. Colwell* (1989), 44 Ohio St.3d 92, 94, 540 N.E.2d 1381, 1383. * * * " In the case *sub judice*, the trial court's order granting the motion to dismiss in a criminal case affects a legal right enforced and protected by law: it granted defendant his freedom from multiple criminal charges. And an entry granting a motion to dismiss also determines the action, thus fulfilling the second criterion.

{¶ 10} Thus, this case presents the issue of whether the third criterion, that of preventing a judgment, was met. We begin our analysis by noting that a conclusion or statement of judgment must be journalized formally to become a final appealable order. Civ.R. 58(A) and Crim.R. 32(C); *State ex rel. Hansen v. Reed* (1992), 63 Ohio St.3d 597, 600, 589 N.E.2d 1324, 1327. See, also, *State ex rel Hanley v. Roberts* (1985), 17 Ohio St.3d 1, 17 OBR 1, 476 N.E.2d 1019; *State ex rel. White v. Junkin* (1997), 80 Ohio St.3d 335, 686 N.E.2d 267.

{¶ 11} In *Hansen* and *White*, cited above, this court held that because the entries determining the convictions and the sentences of the criminal defendants were not journalized, they were not final appealable orders, and thus the trial courts properly vacated their own orders and set the cases for trial. Likewise, in the case *sub judice*, until the trial court's entry determining the final verdict on a criminal complaint is officially journalized, the entry cannot prevent further judgment, since

the trial court can always vacate its own judgment and set the case for trial. Thus, it is not a final appealable order.

{¶ 12} However, in *State ex rel. Grove v. Nadel* (1998), 81 Ohio St.3d 325, 327, 691 N.E.2d 275, 277, we held that either party to an action may file a writ of mandamus or a writ of procedendo in an appellate court to compel the trial court to journalize its judgment if the court fails to do so within the thirty-day period mandated by Sup.R. 7. The judgment would then become a final appealable order on the date of journalization, no matter how delayed. In the case *sub judice*, the judgment likewise became final on September 12, 1995, the date of eventual journalization.

{¶ 13} Because the city's notice of appeal was filed prior to the journalization of the court's judgment, the notice was premature. When a notice of appeal is filed after a judgment is announced, but before the judgment is entered, that notice is treated as filed immediately after the judgment is entered. App.R. 4(C). Thus, in the case *sub judice*, the city's notice of appeal is considered filed and effective on September 12, 1995, the date the court's judgment was filed and became final. Accordingly, the appellate court had jurisdiction to hear the case. App.R. 4(A).

{¶ 14} From the record in the case *sub judice*, it is difficult to ascertain exactly who is at fault for the violation of Sup.R. 7. Because all documents entered in the trial court's file of the case were stamped with the same date for journalization and that date follows shortly after the date on which the city filed its notice of appeal, we can assume that everything was officially journalized on that late date in the case only after being triggered by the filing of a notice of appeal. This is a blatant violation of Sup.R. 7, extremely poor court practice, and inexcusable on the part of the trial court.

{¶ 15} As we state above, the Appellate Rules and the procedures of mandamus and procedendo work to alleviate the detrimental results upon the parties

of an untimely filed judgment, but it is incumbent upon the part of the judiciary to comply with the mandate of Sup.R. 7. Without official journalization within thirty days, nothing that the trial court did in the case was final and all orders could potentially be reversed at any time. See, *e.g.*, *White*, 80 Ohio St.3d 335, 686 N.E.2d 267; *Hansen*, 63 Ohio St.3d 597, 589 N.E.2d 1324. Parties to the action cannot depend on the court's statements and are prohibited from appealing. The Cleveland Municipal Court must see to it that all entries of the court are journalized in an expeditious manner.

{¶ 16} Accordingly, the judgment of the court of appeals on the jurisdictional issue is affirmed.

II

{¶ 17} Having decided that the judgment of the trial court, despite the delay in journalization, is final and appealable, we now address the merits of this case, which raise the issue of whether the Cleveland codified ordinance prohibiting minors from remaining in "billiard rooms" violates the Constitution because it (1) is overbroad, and (2) violates defendant's right to equal protection.

A

Overbreadth

{¶ 18} Defendant first asserts that the ordinance is unconstitutionally overbroad and therefore violates the rights of minors to assemble freely as protected by the First Amendment to the United States Constitution.

{¶ 19} Cleveland Codified Ordinance 688.13 states:

"No owner, operator, agent or keeper of a billiard room shall permit any person who has not reached the age specified in Section 688.12 [fourteen years of age] to remain in a billiard room for any purpose. However, a minor under the age specified in Section 688.12, when accompanied by either parent or his legal guardian, may be permitted to play both billiards and pool, or be in and remain in such parlor or public place. * * * "

**{¶ 20}** Cleveland Codified Ordinance 688.01 defines "billiard room" as "any public place wherein the game of billiards is permitted to be played."

**{¶ 21}** Initially we note that in order to challenge a statute, the challenger must overcome a strong presumption of constitutionality. *State v. Brooks* (1996), 75 Ohio St.3d 148, 155, 661 N.E.2d 1030, 1037, citing *State v. Warner* (1990), 55 Ohio St.3d 31, 43, 564 N.E.2d 18, 30-31. The specific doctrine of overbreadth relates only to First Amendment issues. *Id.*, citing *New York v. Ferber* (1982), 458 U.S. 747, 102 S.Ct. 3348, 73 L.Ed.2d 1113. Under the Ohio Constitution, free speech guarantees are no broader than those guaranteed by the First Amendment to the United States Constitution. *Eastwood Mall, Inc. v. Slanco* (1994), 68 Ohio St.3d 221, 222-223, 626 N.E.2d 59, 61. The First Amendment is the proper basis for interpretation of Section 11, Article I, Ohio Constitution, the provision that establishes those free speech guarantees in Ohio. *Id.*, citing *State ex rel. Rear Door Bookstore v. Tenth Dist. Court of Appeals* (1992), 63 Ohio St.3d 354, 362-363, 588 N.E.2d 116, 123; *Zacchini v. Scripps-Howard Broadcasting Co.* (1978), 54 Ohio St.2d 286, 288, 8 O.O.3d 265, 266, 376 N.E.2d 582, 583; *State v. Kassay* (1932), 126 Ohio St. 177, 187, 184 N.E. 521, 525.

**{¶ 22}** A statute or ordinance may be overbroad "if in its reach it prohibits constitutionally protected conduct." *Grayned v. Rockford* (1972), 408 U.S. 104, 114, 92 S.Ct. 2294, 2302, 33 L.Ed.2d 222, 231; *Akron v. Rowland* (1993), 67 Ohio St.3d 374, 386-387, 618 N.E.2d 138, 148. See, also, *Boos v. Barry* (1988), 485 U.S. 312, 329-330, 108 S.Ct. 1157, 1168, 99 L.Ed.2d 333, 350. In the case *sub judice*, defendant asserts that the ordinance at issue unconstitutionally restricts minors' freedom to associate with friends in a billiard hall. The United States Supreme Court has recognized two types of "freedom of association." *Dallas v. Stanglin* (1989), 490 U.S. 19, 23-24, 109 S.Ct. 1591, 1594, 104 L.Ed.2d 18, 25.

**{¶ 23}** The first type of freedom of association includes the " 'choice[ ] to enter into and maintain certain intimate human relationships.' " *Id.*, quoting

*Roberts v. United States Jaycees* (1984), 468 U.S. 609, 617-618, 104 S.Ct. 3244, 3249, 82 L.Ed.2d 462, 470. These types of associations are the sorts of traditional personal bonds that have " 'played a critical role in the culture and traditions of the Nation by cultivating and transmitting shared ideals and beliefs.' " *FW/PBS, Inc. v. Dallas* (1990), 493 U.S. 215, 237, 110 S.Ct. 596, 611, 107 L.Ed.2d 603, 626, quoting *Roberts*, 468 U.S. at 618-619, 104 S.Ct. at 3250, 82 L.Ed.2d at 472. As such, these relationships receive "protection as a fundamental element of personal liberty." *Roberts* at 618, 104 S.Ct. at 3249, 82 L.Ed.2d at 471. In the case *sub judice*, defendant does not assert that the ordinance prohibits the creation and cultivation of such intimate relationships, only that it prohibits the development of the relationships in a billiard hall. As such, it is not an assertion of personal liberty.

{¶ 24} The second type of freedom of association is the right to associate for the purpose of engaging in expressive activity as protected by the First Amendment. *Stanglin*, 490 U.S. at 24, 109 S.Ct. at 1595, 104 L.Ed.2d at 25. Defendant does not assert that minors gather at billiard halls as "members of any organized association" or to " 'take positions on public questions,' " activities clearly protected by the First Amendment. *Id.* at 24-25, 109 S.Ct. at 1595, 104 L.Ed.2d at 25, quoting *Bd. of Directors of Rotary Internatl. v. Rotary Club of Duarte* (1987), 481 U.S. 537, 548, 107 S.Ct. 1940, 1947, 95 L.Ed.2d 474, 486. The *Stanglin* court stated, "[i]t is possible to find some kernel of expression in almost every activity a person undertakes—for example, walking down the street or meeting one's friends at a shopping mall—but such a kernel is not sufficient to bring the activity within the protection of the First Amendment." *Stanglin*, 490 U.S. at 25, 109 S.Ct. at 1595, 104 L.Ed.2d at 25-26. Likewise, meeting one's friends at a billiard hall "qualifies neither as a form of 'intimate association' nor as a form of 'expressive association' * * *." *Id.* at 25, 109 S.Ct. at 1595, 104 L.Ed.2d at 26.

**{¶ 25}** Because Cleveland Codified Ordinance 688.13 does not prohibit conduct protected by the First Amendment to the United States Constitution or by Section 11, Article I of the Ohio Constitution, the ordinance does not trigger the overbreadth doctrine. Thus, the judgment of the court of appeals as to the overbreadth issue is affirmed.

B

Equal Protection

**{¶ 26}** Defendant next asserts that Cleveland Codified Ordinance 688.13 unconstitutionally violates his right to equal protection because the city enforces the ordinance against privately owned, for-profit billiard halls and not against the city-owned recreation centers in which a billiard table is located. The city does not contest this factual assertion, and, ever since its response to appellant's motion to dismiss in the trial court, the city has readily conceded and justified its policy.

**{¶ 27}** In 1962, the United States Supreme Court articulated the standard for selective prosecution under the Equal Protection Clause to the United States Constitution: a selection "deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification."[2] *Oyler v. Boles* (1962), 368 U.S.

---

2. Because application of this analysis necessarily involves judicial review of law enforcement and prosecutorial discretion, the analysis is different from that of traditional equal-protection analysis, which is used for classifications established by statute. LaFave & Israel, Criminal Procedure (1984) 192-193, Section 13.4; Annotation, What Constitutes Such Discriminatory Prosecution or Enforcement of Laws as to Provide Valid Defense in State Criminal Proceedings (1979; Supp.1998), 95 A.L.R.3d 280; Gifford, Equal Protection and the Prosecutor's Charging Decision: Enforcing an Ideal (1981), 49 Geo.Wash.L.Rev. 659, 679-680. See, also, *People v. Acme Markets, Inc.* (1975), 37 N.Y.2d 326, 372 N.Y.S.2d 590, 334 N.E.2d 555. Cf. *McGowan v. Maryland* (1961), 366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed.2d 393, and *Two Guys From Harrison-Allentown, Inc. v. McGinley* (1961), 366 U.S. 582, 81 S.Ct. 1135, 6 L.Ed.2d 551, in which the Supreme Court held "Sunday blue laws" did not violate the Equal Protection Clause under the traditional statutory rational-basis review (In *Two Guys* the court recognized the potential separate issue of selective enforcement [but held it moot in that specific case].), and *Oyler v. Boles* (1962), 368 U.S. 448, 456, 82 S.Ct. 501, 506, 7 L.Ed.2d 446, 453, in which the Supreme Court established the test of selective prosecution as being deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification.

448, 456, 82 S.Ct. 501, 506, 7 L.Ed.2d 446, 453, citing *Oregon v. Hicks* (1958), 213 Ore. 619, 325 P.2d 794, and referencing *Snowden v. Hughes* (1944), 321 U.S. 1, 64 S.Ct. 397, 88 L.Ed. 497; *Yick Wo v. Hopkins* (1886), 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220.  In *Oyler*, the defendant, a recidivist, had been prosecuted as a "habitual criminal" while a majority of the recidivists in that state were not prosecuted as "habitual criminals."  The United States Supreme Court held that because the defendant could articulate no reason for the prosecution of a small percentage of recidivists as habitual criminals other than the prosecutor's lack of knowledge of the prior offenses of the other offenders, there was no violation of defendant's equal protection rights.

{¶ 28} This court adopted the *Oyler* standard in *State v. Wolery* (1976), 46 Ohio St.2d 316, 325-326, 75 O.O.2d 366, 372, 348 N.E.2d 351, 358, in which it held that the prosecution had not been unconstitutionally discriminatory because

Defendant does not assert a facial equal-protection challenge to Cleveland Codified Ordinance 688.13; such challenge would necessarily be based on the only classification established by the legislation:  minors under fourteen years of age.

Age does not determine a suspect or a quasi-suspect class.  See *Gregory v. Ashcroft* (1991), 501 U.S. 452, 470, 111 S.Ct. 2395, 2406, 115 L.Ed.2d 410, 430; *Qutb v. Strauss* (C.A. 5, 1993), 11 F.3d 488, 492.  And, as stated above, there is no fundamental right to assemble in a pool hall; therefore, the appropriate level of scrutiny is rational-basis review.  See *Gregory* at 470, 111 S.Ct. at 2406, 115 L.Ed.2d at 430; *Roseman v. Firemen & Policemen's Death Benefit Fund* (1993), 66 Ohio St.3d 443, 613 N.E.2d 574.  When we consider the purposes underlying the age distinction as asserted by the city, we believe that the distinction survives this "most relaxed and tolerant form of judicial scrutiny under the Equal Protection Clause."  *Dallas v. Stanglin* (1989), 490 U.S. 19, 26, 109 S.Ct. 1591, 1596, 104 L.Ed.2d 18, 26.  As the United States Supreme Court stated in *Stanglin*, when reviewing a statute prohibiting minors in "dance halls":

"The city could reasonably conclude * * * that teenagers might be susceptible to corrupting influences if permitted, unaccompanied by their parents, to frequent a dance hall with older persons. * * * The city could properly conclude that limiting dance-hall contacts between juveniles and adults would make less likely illicit or undesirable juvenile involvement with alcohol, illegal drugs, and promiscuous sex."  (Citations omitted.)  *Id.* at 27, 109 S.Ct. at 1596, 104 L.Ed.2d at 27.

Likewise, the city in the case *sub judice* could also conclude that billiard rooms in general promote "corrupting influences" that are inappropriate for children.  This rationale is strengthened because the city ordinance includes an exception for minors who are accompanied by a parent or legal guardian, thus ensuring that the minors are protected from any bad influences in the billiard room.  Thus we conclude that Cleveland Codified Ordinance 688.13, on its face, does not violate the Equal Protection Clause.

the defendant articulated no classification defining the difference between those not prosecuted and himself.

{¶ 29} Over the years, this court has referred to the standard as "intentional and purposeful discrimination." *State v. Freeman* (1985), 20 Ohio St.3d 55, 58, 20 OBR 355, 357, 485 N.E.2d 1043, 1045. In *State v. Flynt* (1980), 63 Ohio St.2d 132, 134, 17 O.O.3d 81, 82, 407 N.E.2d 15, 17, this court further refined the standard and articulated a two-part test:

" 'To support a defense of selective or discriminatory prosecution, a defendant bears the heavy burden of establishing, at least *prima facie*, (1) that, while others similarly situated have not generally been proceeded against because of conduct of the type forming the basis of the charge against him, he has been singled out for prosecution, and (2) that the government's discriminatory selection of him for prosecution has been invidious or in bad faith, *i.e.*, based upon such impermissible considerations as race, religion, or the desire to prevent his exercise of constitutional rights.' " (Quoting *United States v. Berrios* [C.A.2, 1974], 501 F.2d 1207, 1211.) See, also, *State v. Getsy* (1998), 84 Ohio St.3d 180, 203, 702 N.E.2d 866, 888; *State v. Lawson* (1992), 64 Ohio St.3d 336, 346, 595 N.E.2d 902, 910; *Freeman*, 20 Ohio St.3d at 58, 20 OBR at 357, 485 N.E.2d at 1045.

{¶ 30} As in *Flynt*, the defendants in *Getsy*, *Lawson*, and *Freeman* did not articulate a specific classification on which the prosecutors were allegedly selectively prosecuting. In *Getsy*, the defendant argued that because some of his codefendants were offered plea bargains in exchange for noncapital charges and he was not offered such a choice, the prosecutors had violated his right to equal protection. In *Lawson*, the defendant alleged that because two of his co-conspirators were not prosecuted, his right to equal protection had been violated. In both of these cases, this court held that the defendants had established neither (1) that others similarly situated had not generally been proceeded against, or (2) that prosecutorial decisions regarding which of multiple co-conspirators to offer plea

bargains and which to prosecute were based upon any impermissible consideration. *Getsy*, 84 Ohio St.3d at 203-204, 702 N.E.2d at 888-889; *Lawson*, 64 Ohio St.3d at 346, 595 N.E.2d at 910.

{¶ 31} In *Freeman*, the defendant alleged that there was another individual who committed the same acts and against whom the prosecutors did not file charges. This court held that "[a] mere showing that another person similarly situated was not prosecuted is not enough; a defendant must demonstrate actual discrimination due to invidious motives or bad faith." *Freeman*, 20 Ohio St.3d at 58, 20 OBR at 357, 485 N.E.2d at 1046. The defendants' arguments in those cases were not enough to overcome the strong presumption that the prosecutors' choices were not discriminatory. *State v. Keene* (1998), 81 Ohio St.3d 646, 653, 693 N.E.2d 246, 255.

{¶ 32} In contrast to those cases, defendant in the case at bar is able to articulate a classification upon which the prosecutors are basing their decisions as to whom to prosecute: profit versus nonprofit billiard rooms. Not only does the city concede that this distinction is its prosecutorial policy, but also it openly asserts the merits of this policy in its brief before this court. The city therefore has conceded the intentional discrimination, and since it did not present evidence to the contrary, defendant has met his burden of showing that others situated similarly to him have not generally been proceeded against because of the same or similar conduct. See, generally, *id.* Accordingly, defendant has met the first prong of the *Oyler/Wolery/Flynt* test.

{¶ 33} Over the years, this court, when considering the second prong of the selective prosecution test, has concentrated on the phrase "based upon such impermissible considerations as race, religion, or the desire to prevent his exercise of constitutional rights." In the case *sub judice*, in which the defendant has alleged a specific policy that deliberately classifies potential defendants, we are required to use the broader test articulated in *Wolery* and *State ex rel. Nagle v. Olin* (1980), 64

Ohio St.2d 341, 18 O.O.3d 503, 415 N.E.2d 279: "[The] selection is 'deliberately based upon an unjustifiable standard such as race, religion, or *other arbitrary classification*.' " (Emphasis added.) *Wolery* at 325-326, 75 O.O.2d at 372, 348 N.E.2d at 358, quoting *Oyler*, 368 U.S. at 456, 82 S.Ct. at 506, 7 L.Ed.2d at 453.[3] See, also, 2 LaFave & Israel, Criminal Procedure (1984) 185-203, Section 13.4; Annotation, What Constitutes Such Discriminatory Prosecution or Enforcement of Laws as to Provide Valid Defense in State Criminal Proceedings (1979; Supp.1998), 95 A.L.R.3d 280; Annotation, What Constitutes Such Discriminatory Prosecution or Enforcement of Laws as to Provide Valid Defense in Federal Criminal Proceedings (1979; Supp.1998), 45 A.L.R.Fed. 732.

**{¶ 34}** The city justifies its discriminatory policy as protective of minors and therefore rational. However, its assertions are based upon assumptions not based on facts and conclusory opinions of what the atmosphere in for-profit billiard rooms is supposedly like. The city asserts that its recreation centers "provide minors with a safe and wholesome environment in which they can spend their time," while the for-profit billiard rooms are less likely to provide adequate security and will tend to be oriented towards the interests of adults, not minors. The city concludes that "[w]hile this does not indicate that the atmosphere in for-profit billiard rooms will necessarily be inappropriate for minors, it would be *more appropriate* for minors who wish to play pool to do so in a [r]ecreation [c]enter." (Emphasis added.)

**{¶ 35}** We state again that defendant has a heavy burden to overcome the strong presumption of regularity in prosecutorial discretion. *Keene* at 653, 693 N.E.2d at 255. See, also, *Getsy*, *Lawson*, *Freeman*, *Flynt*. However, the city's paternalistic view of the differences between privately owned, for-profit billiard

---

3. The *Nagle* court articulated the test for selective prosecution as being "based upon * * * race, religion, exercise of constitutional rights or *other impermissible consideration*." (Emphasis added.) *Nagle v. Olin* (1980), 64 Ohio St.2d 341, 347, 18 O.O.3d 503, 506, 415 N.E.2d 279, 284.

rooms and city-owned, not-for-profit recreation centers, is clearly irrelevant to law enforcement purposes and therefore is not a reasonable basis for systematic discriminatory enforcement and is an arbitrary classification. See, *e.g.*, *United States v. Robinson* (W.D.Mo.1969), 311 F.Supp. 1063 1065-1066 (Enforcement of federal laws regulating wiretapping against private investigators and not against government agents violated equal protection.); LaFave & Israel at 193, Section 13.4. See, also, generally, *People v. Acme Markets, Inc.* (1975), 37 N.Y.2d 326, 331, 372 N.Y.S.2d 590, 594, 334 N.E.2d 555, 558 (Prosecutor's policy of enforcing Sunday closing ["blue"] laws only upon individual complaint is "perhaps unenforceable in an even-handed and fair manner" and therefore violates the guarantee of equal protection.).

{¶ 36} We contrast this rather tenuous justification that the city makes to support its distinction between privately owned and publicly owned billiard rooms with our analysis of the distinction the ordinance makes between those over fourteen years of age and those under fourteen. As we reasoned above, an adult-oriented facility is likely to have alcohol and other "corrupting influences." Not all facilities in which a billiard room is located are such adult-oriented facilities. Defendant represents and the city does not contest that his billiard room does not serve alcohol and is otherwise oriented towards teenagers. The assumptions the city makes about all privately owned billiard rooms thus appear based more on the distinction between adult-oriented facilities versus teenager-oriented facilities as opposed to profit facilities versus nonprofit facilities. Therefore the ordinance on its face passes equal-protection scrutiny but does not under selective-enforcement analysis. See, generally, LaFave & Israel at 195-197, Section 13.4.

{¶ 37} We therefore hold that the prosecutor's discriminatory enforcement of Cleveland Codified Ordinance 688.13 against privately owned, for-profit billiard rooms and not against the city-owned, public recreation centers violates defendant's equal protection as guaranteed by the United States and Ohio

Constitutions.[4]  The judgment of the court of appeals on the equal-protection issue is reversed, and we reinstate the judgment of the trial court granting defendant's motion to dismiss for the reasons stated herein.

*Judgment reversed in part,*

*affirmed in part*

*and cause dismissed.*

DOUGLAS, F.E. SWEENEY, PFEIFER and LUNDBERG STRATTON, JJ., concur.

MOYER, C.J., and COOK, J., concur in part and dissent in part.

————————————

**COOK, J., concurring in part and dissenting in part.**

{¶ 38} I agree with Sections I and II(A) of the majority opinion.  I dissent from the conclusion that the city's method of enforcement violates equal protection.  On this issue, I agree with the analysis of the court of appeals.  I would find that, under the rational-basis test, Trzebuckowski has failed to demonstrate that the city's method of enforcing this ordinance bears no rational relation to the legitimate governmental interest in promoting the welfare of minors.

MOYER, C.J., concurs in the foregoing opinion.

————————————

---

4.  Since adopting the standard for selective enforcement as set forth by the United States Supreme Court in *Oyler*, the Ohio courts have developed an independent selective-enforcement doctrine that is adequately supported by state grounds.  See *Michigan v. Long* (1983), 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201.