[Cite as *Hetrick v. Ohio Dept. of Agriculture*, 2017-Ohio-8118.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
WOOD COUNTY


Kenneth Hetrick

        Appellee

v.

Ohio Department of Agriculture

        Appellant

Court of Appeals Nos. WD-16-061
WD-16-062

Trial Court Nos. 2015CV0447
2015CV0446

**DECISION AND JUDGMENT**

Decided: October 6, 2017

* * * * *

Karen A. Novak and Timothy J. Walerius, for appellee.

Mike DeWine, Ohio Attorney General, James R. Patterson,
Lydia Arko Zigler and Angela M. Sullivan, Assistant Attorneys
General, for appellant.

* * * * *

**OSOWIK, J.**

### Introduction

{¶ 1} In these consolidated, administrative appeals, the Ohio Department of

Agriculture ("ODA") appeals two judgments by the Wood County Court of Common

Pleas. In each, the court found that the agency improperly denied a dangerous wild animal permit to the appellee, Kenneth Hetrick.

{¶ 2} Hetrick applied for two distinct types of permits under Ohio's Dangerous Wild Animals and Restricted Snakes Act, R.C. 935.01 et seq.: a rescue facility permit (case No. WD-16-061) and a wildlife shelter permit (case No. WD-16-062). Following administrative hearings, the director of the ODA denied both applications.

{¶ 3} Pursuant to R.C. 119.12, Hetrick appealed the administrative orders to the Wood County Court of Common Pleas. The court found that the ODA had improperly denied the permits and discriminated against him.

{¶ 4} On appeal, the ODA argues that its respective orders, denying the applications, were based on reliable, probative and substantial evidence and were in accordance with law.

{¶ 5} We agree with the ODA, in part. As set forth below, we reinstate the decisions of the director to deny Hetrick both the rescue facility and the wildlife shelter permits.

**Overview of the Dangerous Wild Animals and Restricted Snakes Act**

{¶ 6} In 2011, an Ohio man released dozens of wild animals from his private preserve, before taking his own life. As the animals freely roamed the preserve and neighboring properties, law enforcement authorities were forced to shoot them.

2.

{¶ 7} In response, the Ohio General Assembly passed the Dangerous Wild Animals and Restricted Snakes Act, R.C. Chapter 935, which went into effect on September 5, 2012. "The act tasks the ODA with implementing and enforcing a comprehensive statutory scheme regarding the registration and control of dangerous wild animals." *State ex rel. Dir., Ohio Dept. of Agriculture v. Forchione*, 148 Ohio St.3d 105, 2016-Ohio-3049, 69 N.E.3d 636, ¶ 4. The act also applies to restricted snakes, but this case involves, and our discussion of the statute is limited to, dangerous wild animals only.

{¶ 8} Generally, the act prohibits the possession of non-permitted dangerous wild animals ("DWA") after January 1, 2014. The ODA implemented the act in two phases. First, any person who possessed a DWA on September 5, 2012, had to register that animal by November 5, 2012. R.C. 935.04(A). The registration of DWA provided the agency with information regarding the number and kind of DWA in the state, the identity of those who possessed DWA, and the locations where the animals were confined. *Hetrick v. Ohio Dept. of Agriculture*, 10th Dist. Franklin No. 15AP-944, 2017-Ohio-303, ¶ 3. Registrants had to permanently implant each animal with a microchip that could identify the animal. R.C. 935.04(D). Additionally, registrants had to comply with certain requirements for the care and housing of the animals. *Id.*; R.C. 935.04(C); Ohio Adm.Code Chapter 901:1-2.

3.

**{¶ 9}** Phase two of the act began on January 1, 2014. Starting on that date, it became illegal to possess a DWA in Ohio. R.C. 935.02(A). The prohibition against possession of DWA does not apply to certain people and organizations, however, including "[a] person whose possession of a [DWA] is authorized by an unexpired permit issued under this chapter." R.C. 935.03(A)(3). *Id.* at ¶ 4.

**{¶ 10}** A person who possessed a DWA prior to January 1, 2014, could apply for one of three types of permits: a wildlife shelter permit (R.C. 935.05), a wildlife propagation permit (R.C. 935.07), or a rescue facility permit (R.C. 935.101(A)(1)). *Hetrick* at ¶ 4. As an alternative to the permitting process, an owner could seek an exemption. *See* R.C. 935.03(B)(1). None of the exemptions is applicable to this case.

**{¶ 11}** According to the ODA, following the January 1, 2014 deadline, the director had 90 days to approve or reject permit applications. R.C. 935.06(A). The ODA treated this statutory, 90-day period (i.e. between January 1 and March 31, 2014) as a type of grace period. During this time, the ODA continued to reach out to individuals who had registered DWA but had not yet applied for a permit. It also reached out to those who had submitted incomplete applications.[1] According to the ODA, all DWA owners were

---

[1] The ODA relies upon R.C. 935.06(A) to support its position that it could consider applications filed by March 31, 2014. The statute, applicable to *wildlife shelter permits*, provides, "No later than ninety days after receipt of an application under section 935.05 of the Revised Code, the director of agriculture shall issue or deny a wildlife shelter permit."

given the benefit of the additional 90 days to submit and complete their permit application paperwork. The ODA received 64 DWA permits within the first quarter of 2014.

{¶ 12} An owner who was not able to obtain a permit or qualify for an exemption was obligated to transfer, within 30 days, all DWA that the person possessed to an approved organization, such as the humane society or wildlife sanctuary. R.C. 935.06(F).

{¶ 13} The act requires the director of the ODA to open an investigation if there is "reason to believe" that a DWA is possessed by an unauthorized person or if the director believes that a DWA is being treated or kept in a manner that violates the law. R.C. 935.20(A). The director may order the DWA to be quarantined on site or transferred to an eligible facility. R.C. 935.20(A). The act calls for civil and criminal penalties for non-compliance. R.C. 935.24(B)(1) and 935.99.

{¶ 14} Finally, the director of the ODA "has exclusive authority to implement and enforce R.C. Chapter 935." *Forchione* at ¶ 25.

### Hetrick's Possession and Registration of DWA

{¶ 15} Kenneth Hetrick is a resident of Perrysburg, Ohio, in Wood County. Hetrick has possessed exotic animals since 1977 and operates an animal sanctuary on his property called Tiger Ridge Exotics. In all his years of housing and caring for DWA, there has never been an incident involving an animal escaping or injuring someone.

5.

{¶ 16} Hetrick has a "Class C Exhibitor" license for his facility from the United States Department of Agriculture. Throughout the time Hetrick has possessed DWA, he has invited the public to his property to observe them.

{¶ 17} In October of 2012, following passage of Ohio's law, Hetrick submitted registration paperwork, identifying 15 DWA: seven tigers, three lions, one "liger," two grizzly bears, one black leopard and a bobcat.[2]

{¶ 18} In November of 2013, Hetrick received a "compliance packet" with instructions and materials that explicitly notified him that a "valid permit is required to maintain ownership of any dangerous wild animal beyond January 1, 2014." Hetrick did not apply for a permit by that date.

{¶ 19} The ODA sent Hetrick follow-up letters on February 10 and March 10, 2014, reminding him of his obligation to apply for a permit if he wished to continue to possess DWA. In its March 10, 2014 letter, the ODA stated, "we wish to work with you to obtain your DWA permit. Contact us for any further assistance you need to comply with Ohio law no later than 10 business days." It is undisputed that Hetrick received those letters. Hetrick did not apply for a permit by March 31, 2014, the last day of the 90-day grace period.

---

[2] The bobcat is not identified as a DWA under R.C. 935.01(C). *See Federer v. Ohio Dept. of Natural Resources*, 10th Dist. Franklin No. 15AP-104, 2015-Ohio-5368, ¶ 17.

6.

{¶ 20} The record indicates that Hetrick did not apply for a permit because (1) he knew his facility was not in compliance with the act; (2) he found the permit requirements confusing; and (3) he was waiting for a decision in a federal lawsuit that would decide if the act would be upheld. *See Wilkins v. Daniels*, 744 F.3d 409 (6th Cir.2014). In *Wilkins*, the Sixth Circuit Court of Appeals rejected two constitutional challenges. It found that the act did not compel DWA owners to associate with organizations, such as the Zoological Association of America, in violation of the owners' First Amendment rights. It also found that the microchip requirement did not amount to a "taking" in violation of the Fifth Amendment.

### Hetrick's Application for a Rescue Facility Permit

{¶ 21} On October 17, 2014, Hetrick applied for a rescue facility permit. The ODA responded that it was untimely and incomplete. It requested that "an on-site visit occur to verify that the facility meets the care and caging standards that were adopted in OAC 901:1-4." Hetrick consented to the visit.

{¶ 22} The visit occurred on November 7, 2014, during which the ODA claimed it found a number of violations.

{¶ 23} On January 13, 2015, the ODA proposed to deny Hetrick's application for a rescue facility permit because: (1) it was untimely pursuant to R.C. 935.101, specifically, 289 days after the January 1, 2014 statutory deadline, and 200 days after the

7.

end of the 90-day grace period; and (2) Hetrick failed to comply with the caging and care requirements under R.C. 935.12 and Ohio Adm.Code 901:1-4.

{¶ 24} Two weeks after proposing to deny the permit, on January 28, 2015, the ODA served upon Hetrick a search warrant and a "transfer order." R.C. 935.20. Pursuant to that transfer order, the ODA removed 11 DWA from his property. Hetrick challenged the transfer of his animals in a separate administrative appeal. The transfer was upheld by the Franklin County Court of Common Pleas and affirmed by the Tenth District Court of Appeals. *Hetrick v. Ohio Dept. of Agriculture*, 10th Dist. Franklin No. 15AP944, 2017-Ohio-303. At the conclusion of the agency's investigation and exhaustion of administrative remedies, the director *may* pursue the permanent seizure of Hetrick's DWA. R.C. 935.20(H). The record in the instant case contains repeated references to evidence offered with regard to the transfer of Hetrick's DWA. As noted by the ODA, however, the issue before this court is limited to the issuance of permits, not the custody of Hetrick's animals.

{¶ 25} Hetrick requested an administrative hearing as to the proposed denial of the rescue facility permit, which occurred over the course of four days and concluded on May 11, 2015. The hearing examiner made the following findings of fact:

> Hetrick submitted his application for a rescue permit on October 17, 2014.

8.

During the on-site visit, ODA officials observed many deficiencies under R.C. 935 and OAC Chapter 901:1-4. Most of the deficiencies involve inadequate caging, primary and secondary fencing, and inadequate dig barriers, all of which posed escape risks for the animals and/or unauthorized access to the animals by humans. Other deficiencies noted by the hearing examiner posed risks to the animals, such as exposed metal edges, choking and ingestion hazards, and a lack of fresh drinking water.

Between January 1 and March 31, 2014, the ODA accepted permit applications and reached out to other registered owners who had not yet submitted applications. The ODA accepted one application on April 3, 2014, i.e. after the first quarter, from one applicant who had "worked diligently with the ODA to get her DWA permit application completed."

Hetrick spent between $35,000 and $40,000 to bring his property into compliance with the act.

{¶ 26} The hearing officer recommended that Hetrick's permit be denied based upon his "systemic lack of compliance with R.C. Chapter 935." The ODA director adopted the hearing officer's report and recommendation. Pursuant to R.C. 119.12, Hetrick filed a notice of appeal with the Wood County Court of Common Pleas.

9.

**Hetrick's Application of a Wildlife Shelter Permit**

{¶ 27} After the administrative denial of his rescue permit, Hetrick applied for a wildlife shelter permit. According to the ODA, this type of permit allows legal possession of DWA after January 1, 2014, but prohibits acquiring any additional DWA. R.C. 935.05.

{¶ 28} The ODA proposed to deny the application for two reasons: it was untimely and not all of the DWA identified in the application had been implanted with a microchip.

{¶ 29} Hetrick requested a hearing, held on May 26, 2015, just two weeks after his rescue permit hearing. The same hearing officer heard both matters. Specific to the wildlife permit, the hearing officer made the following findings of fact:

Hetrick submitted the application on March 9, 2015. His application identified 11 DWA: six tigers, one lion, one liger, a grizzly bear, a leopard, and a cougar. Of them, six DWA had not been microchipped.

A microchip is "a device the size of a grain of rice that contains identification information and is implanted under the skin."

Hetrick provided a letter with the application from his veterinarian, identifying six DWA that were too old for anesthetic.

"Hetrick had not worked with the ODA to obtain a wildlife shelter permit."

10.

"The ODA has not issued a wildlife shelter permit to anyone who waited until after the first quarter of 2014 to initiate the application process."

{¶ 30} The ODA director adopted the hearing officer's report and recommendation to deny Hetrick's application. Pursuant to R.C. 119.12, Hetrick filed a notice of appeal with the Wood County Court of Common Pleas.

**Proceedings before the Wood County Court of Common Pleas**

{¶ 31} At Hetrick's request and over the ODA's objection, the trial court received additional evidence and heard two days of testimony before it issued simultaneous decisions, on November 21, 2016. In short, the court found that there was no statutory authority to deny either application and that the ODA had discriminated against Hetrick by treating other applicants more favorably than Hetrick. The court then ordered the ODA to issue both permits.

{¶ 32} The judgments were stayed pending appeal, and, as stated, we consolidated the cases sua sponte.

{¶ 33} The ODA brings two assignments of error for our review.

**The ODA's Assignments of Error**

1. In both appeals, the trial court failed to review the Director's Order in accordance with mandatory guidelines set forth in R.C. 119.12 and relied upon the incorrect legal standard.

11.

2. In both appeals, the trial court abused its discretion and committed reversible error in finding, in the absence of evidence and under an incorrect legal standard, that Hetrick had been subjected to intentional and purposeful discrimination

**Standard of Review**

{¶ 34} A decision by the director to deny a wildlife animal permit is appealable pursuant to R.C. 119.12(A).

{¶ 35} The standard of review applied by a common pleas court and an appellate court in an administrative appeal under R.C. 119.12 is "well established." *Bartchy v. State Bd. of Edn.*, 120 Ohio St.3d 205, 2008-Ohio-4826, 897 N.E.2d 1096, ¶ 34.

{¶ 36} When a common pleas court reviews an order of an administrative agency, it must affirm the agency's order if it is supported by "reliable, probative, and substantial evidence and is in accordance with law." R.C. 119.12(M); *City of Mentor v. Sines, Inc.,* 10th Dist. Franklin No. 15AP-171, 2015-Ohio-5546, ¶ 7. Reliable evidence is "dependable and true," within a reasonable probability. Probative evidence is relevant evidence that tends "to prove the issue in question." Substantial evidence must have "importance and value." *Id*. at ¶ 37, quoting *Our Place, Inc. v. Ohio Liquor Control Comm.*, 63 Ohio St.3d 570, 571, 589 N.E.2d 1303 (1992).

{¶ 37} A common pleas court conducts two inquiries: a hybrid factual/legal inquiry and a purely legal inquiry. *Id*. at ¶ 37. As explained by *Bartchy*,

As to the first inquiry, * * * [a]n agency's findings of fact are presumed to be correct and must be deferred to by a reviewing court unless that court determines that the agency's findings are internally inconsistent, impeached by evidence of a prior inconsistent statement, rest upon improper inferences, or are otherwise unsupportable. * * *

As to the second, legal part of the common pleas court's inquiry, an agency adjudication is like a trial, and while the reviewing court must defer to the lower tribunal's findings of fact, it must construe the law on its own. (Quotation omitted.) *Id*. at ¶ 37-38, citing *Ohio Historical Soc. v. State Emp. Relations Bd.*, 66 Ohio St.3d 466, 470-471, 613 N.E.2d 591 (1993).

{¶ 38} An appellate court's role is more limited than that of a trial court. *Id.* While the trial court examines the evidence, the appellate court is "to determine only if the trial court has abused its discretion in its examination of the record for reliable, probative, and substantial evidence." *Id*. at ¶ 41. An abuse of discretion "implies not merely error of judgment, but perversity of will, passion, prejudice, partiality, or moral delinquency." (Citations omitted.) *Id*. at ¶ 41, citing *Bd. of Edn. of Rossford Exempted Village School Dist. v. State Bd. of Edn.*, 63 Ohio St.3d 705, 707, 590 N.E.2d 1240 (1992). Absent an abuse of discretion on the part of the trial court, a court of appeals must affirm the trial court's judgment. *Id*.

13.

**{¶ 39}** Finally, our scope of review is "plenary, including the issue of whether the common pleas court applied the proper standard of review." *Id*. at 43.

### The lower court ignored the plain language of the act in finding that there was no statutory authority to deny either permit.

**{¶ 40}** In each case, the lower court reviewed the administrative record and generally made no new findings of fact. As a matter of law, however, it concluded that "there [was] no statutory authority" to deny either permit. As discussed below, we disagree with the lower court's legal conclusions.

**{¶ 41}** Effective January 1, 2014, it became illegal to possess DWA in Ohio. R.C. 935.02(A) ("No person shall possess a dangerous wild animal on or after January 1, 2014.") R.C. 935.02(B) provides for exceptions to that rule, including the issuance of a wildlife shelter permit (R.C. 935.06) and a rescue facility permit (R.C. 935.101).

1. *Hetrick's rescue facility application was untimely*.

**{¶ 42}** The rescue facility statute, set forth in R.C. 935.101, provides, in part,

(A)(1) In lieu of obtaining any other permit under this chapter, a person that operates a rescue facility in this state prior to January 1, 2014, and that wishes to continue to operate a rescue facility on and after that date shall obtain a rescue facility permit under this section not later than January 1, 2014.

14.

(A)(2) A person that wishes to begin operation of a rescue facility in this state on or after January 1, 2014, shall obtain a rescue facility permit under this section not later than sixty days prior to beginning operation.

{¶ 43} Thus, existing rescue facilities were required to obtain a permit by January 1, 2014, while new rescue facilities must obtain a new permit no later than 60 days prior to beginning operation.

{¶ 44} Hetrick, as a person who had registered DWA in 2012, was aware of the January 1, 2014 permit deadline and received two reminders after he failed to apply by that date. Again, however, the ODA considered applications that were submitted within 90 days of that deadline, by March 31, 2014, to be timely.

{¶ 45} The hearing officer found, and it is unchallenged, that Hetrick waited until October 17, 2014, to apply for a rescue facility permit. Under the explicit language of the statute, Hetrick's application was 289 days late. By the DOA's more lenient deadline, it was 200 days late. The hearing officer's finding, that Hetrick's rescue facility permit was untimely, was based upon reliable, probative and substantial evidence.

{¶ 46} The common pleas court concluded, however, that "[t]here is no evidence in the record or otherwise that Mr. Hetrick operated a rescue facility as defined in R.C. 935.01(K) at any time prior to January 1, 2014." Instead, the court concluded that Hetrick's application for a rescue permit was not as an existing facility under R.C. 935.101(A)(1) but rather as a new facility under section (A)(2). That section is

15.

applicable to applicants who wish to "*begin* operation of a rescue facility in this state *on or after January 1, 2014*." (Emphasis added.) The court also determined that Hetrick's application was not untimely because "there is absolutely no requirement that a person desiring to operate a rescue facility at any time after January 1, 2014, has to file that person's application prior to January 1, 2014." The court acknowledged that even under section (A)(2), however, Hetrick would have been in violation of the deadline set forth therein. That is, as a person who possessed DWA for years, Hetrick failed to pursue a permit within 60 days of beginning operation.

{¶ 47} Also, the court did not explain how Hetrick's operation failed to meet the definition of "rescue facility." R.C. 935.01(K) defines a "Rescue facility" as:

> a nonprofit organization as described in section 170 of the "Internal Revenue Code of 1986," 100 Stat. 2085, 26 U.S.C. 170, as amended, that operates a place of refuge where abused, neglected, unwanted, impounded, abandoned, orphaned, or displaced dangerous wild animals are provided care for their lifetime or released back to their natural habitat, and, with respect to an animal possessed by the organization, that does not do any of the following: (1) Sell, trade, or barter the animal or the animal's body parts; (2) Use the animal in any manner for profit; (3) Breed the animal; (4) Allow the public the opportunity to come into contact with the animal.

16.

{¶ 48} Both types of permits under R.C. 935.101 pertain to a "rescue facility," as defined above. The lower court did not address how Hetrick's application would qualify for a permit under section (A)(2) if it did not qualify for one under section (A)(1).

{¶ 49} For his part, Hetrick argues that he was "unequivocally" not operating a rescue facility prior to January 1, 2014, because he was not operating as a non-profit organization. We rejects Hetrick's argument that his failure to seek non-profit status acts as a shield from the January 1, 2014 deadline. While the ODA did not cite Hetrick's omission as a basis to deny the rescue facility permit, it could have. Either way, it is not determinative of whether section (A)(1) or (A)(2) applies in this case.

{¶ 50} We also reject Hetrick's argument that he did not "[hold] himself out as a rescue facility" prior to January 1, 2014. First, to state the obvious, Hetrick has possessed DWA for 40 years, and he concedes that he "accepted animals from others." Also, the "Application for Rescue Facility Permit" submitted by Hetrick contains a box marked "New Applicant." Hetrick did not mark that box; instead, he left it blank. If Hetrick intended to apply as someone who "wish[ed] to begin operation of a rescue facility," under section (A)(2) of the statute, it stands to reason that he would have checked the "New Applicant" box. Third, despite his argument to the contrary, Hetrick did hold himself out as a rescue facility. Metal signage at Tiger Ridge reads "animal sanctuary." Likewise, at least two of the animals identified in the application, "Bobby,"

17.

the bobcat and "Cyndi," a cougar, were identified as having been rescued from previous owners who could no longer care for them.

{¶ 51} In sum, Hetrick engaged in activity that qualified his property as a rescue facility. That is, he operated a place of refuge for unwanted DWA, and he did so prior to January 1, 2014. We find, as a matter of law, that the trial court erred when it found that section (A)(1), and its corresponding deadline, did not apply.

{¶ 52} Moreover, it bears repeating that under either option, Hetrick's application for a rescue facility permit was months late. As an existing rescue facility, Hetrick's application was untimely because R.C. 935.101(A)(1) required that the permit be obtained prior to January 1, 2014. Alternatively, under section (A)(2), Hetrick failed to file an application for a new rescue facility permit "at least sixty days prior to beginning operation" since he was in possession of 11 dangerous wild animals well over 60 days prior to submitting any application.

{¶ 53} The rescue facility permit was denied for a second reason, namely Hetrick's failure to comply with the caging and care requirements under R.C. 935.12 and the accompanying regulations set forth under Ohio Adm.Code 901:1-4.

{¶ 54} R.C. 935.12, entitled "Care and housing of dangerous wild animals – requirements," provides, in part,

> (A) Except as provided in division (B) of this section, *a person that has been issued a permit under this chapter* for a dangerous wild animal or

18.

animals *shall comply* with the requirements regarding the care and housing of dangerous wild animals established in rules.

(B) *A person that has been issued a * * * rescue facility permit* under this chapter for a dangerous wild animal or animals specified in division (C)(20) of section 935.01 of the Revised Code *shall comply* with both of the following:

(1) The requirements regarding the care of those animals established in regulations adopted under the federal animal welfare act;

(2) The requirements regarding the housing of those animals established in rules.  (Emphasis added.)

{¶ 55} Likewise, Chapter 901:1-4 of the Ohio Administrative Code governing DWA sets forth a series of rules governing, for example, enclosures of DWA (Rule 901:1-4-01.1); food and water for DWA (Rule 901:1-4-01.2) and health of DWA (Rule 901:1-4-01.3).  These rules apply to DWA that are "possessed by the holder of a * * * rescue facility permit issued under Chapter 935 of the Revised Code."  Ohio Adm.Code 901:1-4-01(A).

{¶ 56} In finding that Hetrick's alleged caging and care violations could *not* create a basis to deny the permit, the lower court cited R.C. 935.101(D).  It, too, provides that "[a] person that *has been issued* a rescue facility permit under this section *shall comply* with the requirements regarding the care and housing of [DWA] established in rules

adopted under division (G) of section 935.17 of the Revised Code." (Emphasis added.) The common pleas court concluded that the "statute clearly contemplates the issuance of a rescue facility permit followed by inspections * * *." In other words, the court determined that because Hetrick had not been issued a permit, the regulations did not apply to him and could not support the denial of the permit.

{¶ 57} The ODA counters that the regulations did apply to Hetrick by virtue of an affidavit he signed that was part of the application. Hetrick certified "that the facility [is] in compliance with standards of Ohio Revised Code Section 935.01, et seq., and the Ohio Administrative Code Section 901:1-4-01 et seq." The ODA asserts that, after submitting an application and attesting that an applicant is in compliance, "successful applicants are then subjected to a post-permitting inspection to confirm compliance, and they are given time to address any deficiencies." The ODA argues that this process is a "reasonable and efficient way to administer the legal requirements without delaying every application until a formal inspection takes place."

{¶ 58} The parties argue over whether the ODA's "on-site visit" in November of 2014 constituted a formal inspection or not. Hetrick claims that the ODA essentially inspected the facility out-of-order. That is, it inspected the facility as a means of gathering information that it then used to deny the permit.

{¶ 59} The issue before us is not whether the ODA has the authority to conduct a post-permitting inspection; clearly, it does. On the other hand, Hetrick's situation was

20.

different, in that he was not a "successful applicant" who was subject to a "post-permitting inspection." Irrespective of the on-site visit, the issue is whether the ODA had the statutory authority to deny Hetrick's rescue facility permit for failing to comply with the caging and care regulations set forth in Ohio Adm.Code 901:1-4:01 et seq.

{¶ 60} We find that it did not. Based upon the explicit language of the statutes cited above, we agree with the lower court that "there is nothing in R.C. Chapter 935 permitting the ODA to deny a rescue facility permit for failing, initially, to meet proper caging and care requirements." *See also Hetrick v. Ohio Dept. of Agriculture*, 10th Dist. Franklin 15AP-944, 2017-Ohio-303, ¶ 4 ("*Once issued a permit*, a permit holder must comply with more specific and onerous care and housing requirements than those applied during the registration stage. *Compare* Ohio Administrative Code Chapter 901:1-2 *with* 901:1-4."). (Emphasis added). We conclude that the lower court did not err, as a matter of law, in finding that the ODA could not deny Hetrick's permit based upon his alleged failure to comply with those regulations.

{¶ 61} In conclusion, the trial court abused its discretion in finding that the ODA lacked a statutory basis to deny the application on timeliness grounds but did not err in so finding on caging and care grounds. We reverse the judgment of the lower court on the former basis alone.

2. *Hetrick's wildlife shelter application was untimely and legally deficient on its face*.

21.

{¶ 62} R.C. 935.05(A) provides that a "person that possesses a registered dangerous wild animal in this state on October 1, 2013, that wishes to continue to possess the dangerous wild animal on and after January 1, 2014 * * * shall apply for a wildlife shelter permit under this section."

{¶ 63} Hetrick's wildlife application was subject to the same deadline as was his rescue facility application, i.e. January 1, 2014. After that date, Hetrick was in violation of the act by possessing DWA without a permit. Notwithstanding that deadline, the ODA contacted Hetrick and other registered DWA owners to encourage them to apply for a permit, and it accepted applications through March 31, 2014. According to the hearing officer, however, Hetrick did not work with the ODA to obtain a wildlife shelter permit. When he did finally apply, on March 9, 2015, he was 15 months late, or 434 days after the January 1, 2014 deadline. The hearing officer's finding, that Hetrick's rescue facility permit was untimely, was based upon reliable, probative and substantial evidence.

{¶ 64} Nonetheless, the trial court analyzed the wildlife shelter permit issue as follows:

Yes, Mr. Hetrick possessed registered DWA in Ohio on October 1, 2013. Yes, Mr. Hetrick wishes to continue to possess the DWA on and after January 1, 2014. And yes, Mr. Hetrick applied for a wildlife shelter permit. * * * At any time from January 1, 2014 to March 23, 2015, Director Daniels could have sought to enjoin Mr. Hetrick from possessing his DWA

22.

without a permit [pursuant to R.C. 935.24(A).]  This section also provides for the assessment of civil penalties against the violator.  Director Daniels did not opt for this course of action. * * * *The court finds there is no statutory authority for the proposition that a person who possessed registered DWA in Ohio on October 13, 2013, and who failed to apply for a wildlife shelter permit before January 1, 2014, is barred from applying for and receiving a wildlife shelter permit.*   (Emphasis added.)

{¶ 65} As a matter of fact, the court's statement is inaccurate because, as repeatedly discussed, the DOA permitted applications through March 31, 2014.  More importantly, the lower court did not address the untimeliness of Hetrick's application.

{¶ 66} The lower court may not ignore the statutory deadline, simply because it finds that the ODA's motives were "disingenuous."  By all accounts, Hetrick's application was late, by over a year.  It was error to ignore the plain and unambiguous language of the statute under the guise of statutory interpretation.  *State v. Kurtz*, 28 Ohio St.3d 36, 38, 502 N.E.2d 210 (1986).

{¶ 67} In addition to its untimeliness, the ODA also cited Hetrick's failure to microchip six DWA that he identified in his application.

{¶ 68} R.C. 935.05(B)(4) provides that an application for a wildlife shelter permit "shall include * * * [t]he identification number of the microchip that is implanted in each dangerous wild animal * * *."  Moreover, R.C. 935.06 provides that the director "shall

23.

issue a permit to an applicant *only if* all of the following apply:  * * * (9) The applicant has submitted a complete application that meets the requirements established in section 935.05 of the Revised Code."  (Emphasis added.)

{¶ 69} Here, the lower court recognized that "each DWA must be * * * microchipped" and that it is an "unconditional obligation" to the permitting process. Nonetheless, the court found the ODA's denial of the permit on this basis was "unlawful."  Notwithstanding the statutory directive, the court opined that the ODA should have consulted with Hetrick's veterinarian and/or investigated the medical hazards of microchipping.  The lower court found that the ODA violated its commitment of "working with Ohio's dangerous wild animal owners."  This language comes from a letter the ODA sent to Hetrick on October 17, 2014, five months before he applied for a wildlife shelter permit.

{¶ 70} First, the lower court credited Hetrick's veterinarian as having opined that "the process of microchipping several of Mr. Hetrick's animals could be dangerous to their health."  The record lacks any such opinion by Hetrick's veterinarian.

{¶ 71} We similarly reject the lower court's legal conclusion that there is no statutory authority to deny the permits based upon Hetrick's failure to microchip.  In fact, the opposite is true.  The statute explicitly compels microchipping as a precondition to obtaining a permit.  The lower court's imposition of a duty upon the ODA, to "work with" DWA owners, cannot supplant the clear directive from the legislature on this point.

24.

{¶ 72} A reviewing court must give deference to an administrative agency's interpretation of its own rules and regulations where such interpretation is consistent with the statutory law and the plain language of the rules. *State ex rel. Celebrezze v. Natl. Lime & Stone Co.*, 68 Ohio St.3d 377, 382, 627 N.E.2d 538 (1994); *Jones Metal Products Co. v. Walker*, 29 Ohio St.2d 173, 181, 281 N.E.2d 1 (1972). We find that the lower court substituted its judgment for that of the ODA's when it ordered the ODA to grant Hetrick's application for a wildlife shelter permit.

{¶ 73} In sum, we find that the trial court erred when it found that the ODA lacked statutory authority to deny the rescue facility and wildlife shelter permits. We reinstate the agency's decision denying the permits. The ODA's first assignment of error is well-taken.

**The lower court erred in finding that the ODA discriminated against Hetrick.**

{¶ 74} The lower court determined that, even if the ODA's denial of permits was statutorily permissible, "the issue is then whether the ODA's denial of Mr. Hetrick's application and the attendant confiscation of his animals deprived [him] of due process and equal protection of the law."

{¶ 75} The Fourteenth Amendment to the United States Constitution provides that "[n]o state shall * * * deny to any person within its jurisdiction the equal protection of the laws." The Equal Protection Clause in the Ohio Constitution is "functionally equivalent" to the right established by the Fourteenth Amendment. *Am. Ass. of Univ. Professors,*

*Cent. State Univ. Chapter v. Cent. State Univ.*, 87 Ohio St.3d 55, 59, 717 N.E.2d 286 (1999).

{¶ 76} "A statute may be unconstitutional as applied if the government selectively enforces it in violation of equal protection rights." *Fagan v. Boggs*, 4th Dist. Washington No. 10CA17, 2011-Ohio-5884, ¶ 23-24. "Though the law itself [may] be fair on its face, and impartial in appearance, yet, if it is applied and administered by public authority with an evil eye and an unequal hand, so as practically to make unjust and illegal discriminations between persons in similar circumstances, material to their rights, the denial of equal justice is still within the prohibition of the constitution." *Id.* at ¶ 23, quoting *Yick Wo v. Hopkins*, 118 U.S. 356, 373-374, 6 S.Ct. 1064, 30 L.Ed. 220 (1886).

{¶ 77} The Supreme Court of Ohio has created a two-part test necessary to satisfy a defense of selective prosecution:

> To support a defense of selective or discriminatory prosecution, a defendant bears the heavy burden of establishing, at least prima facie, (1) that, while others similarly situated have not generally been proceeded against because of conduct of the type forming the basis of the charge against him, he has been singled out for prosecution, and (2) that the government's discriminatory selection of him for prosecution has been invidious or in bad faith, i.e., based upon such impermissible considerations

26.

as race, religion, or the desire to prevent his exercise of constitutional rights.  *State v. Flynt*, 63 Ohio St.2d 132, 134, 407 N.E.2d 15 (1980).

{¶ 78} Because a suspect class or a fundamental right is not involved in this case, a legislative distinction need only bear a rational relationship to a legitimate state interest to comply with the Equal Protection Clause.  *Hetrick*, 10th Dist. Franklin No. 15AP-944, 2017-Ohio-303, at ¶ 57 (Ownership of DWA "does not rise to the level of a constitutionally fundamental property interest.").  Where the traditional rational basis test is used, great deference is paid to the state.  *State ex rel. Heller v. Miller*, 61 Ohio St.2d 6, 11, 399 N.E.2d 66 (1980).

{¶ 79} The same standard applies to claims of selective enforcement in administrative proceedings as to claims in a criminal prosecution.  *See, e.g., Brownlee v. State Med. Bd.*, 10th Dist. Franklin No. 13AP-239, 2013-Ohio-4989, ¶ 31.

{¶ 80} The court found that the ODA "purposefully and intentionally discriminated against Mr. Hetrick" based upon the following:

(1) "The ODA granted some permit applications filed after January 1, 2014 but denied Mr. Hetrick's."

(2) "Second, the ODA made several material misrepresentations to this court on January 28, 2015 when it sought the warrant to search Mr. Hetrick's facility."  The court cited testimony by a state official who said

27.

that Hetrick's DWA were kept in "crammed cages" and who described Hetrick as uncooperative "from day one."

(3) "The ODA materially distorted its findings from its November 7, 2014 inspection."

(4) "The whole process by which the ODA evaluated Mr. Hetrick's application was very disingenuous. * * * In good faith Mr. Hetrick consented to the November 7, 2014 inspection that the ODA represented to him was part of the application process. That inspection was, in reality a scouting expedition so the ODA could be prepared to seize and confiscate Mrs. Hetrick's animals."

{¶ 81} We begin with the lower court's finding, under *Flynt*, that the ODA selectively enforced the permit deadlines by granting "some permit applications filed after January 1, 2014 but [denying] Mr. Hetrick's." To support that conclusion, the lower court cited an appendix that it created and attached to its judgment entries. In each appendix, the court identified four other wildlife shelter applicants who, it found, were similarly situated to Hetrick but who received more favorable treatment than he did.

{¶ 82} Of the four applicants, three filed their applications in March of 2014, i.e. before the expiration of the DOA's deadline. These applicants were not similarly situated to Hetrick because their applications were timely. As a threshold matter, the complaining

party must demonstrate that he or she was treated differently than other persons under like circumstances. *Fagan*, 9th Dist. Washington No. 10CA17, 2011-Ohio-5884 at ¶ 30.

{¶ 83} The fourth applicant identified in the appendix, "P.W.," filed an application on April 7, 2014. Thus, assuming the accuracy of the appendix, P.W. received a permit despite filing for it seven days after the March 31, 2014 deadline.

{¶ 84} We find a qualitative difference between an application filed a number of days late, like P.W.'s, and ones that were filed between six and twelve months late, like Hetrick's. Thus, even if P.W. were considered to be similarly situated as Hetrick, "the conscious exercise of some selectivity in enforcing a statute fair on its face does not in and of itself amount to a constitutional violation." (Citations omitted.) *Whitehall v. Moling*, 40 Ohio App.3d 66, 69, 532 N.E.2d 184 (10th Dist.1987). Indeed, "the mere fact that a governmental agency applied a statute differently in one instance is not sufficient to establish selective enforcement. Instead, in order to establish a violation of the right to equal protection, a party must show that the agency purposely or intentionally discriminated in its application of the statute." *Tsagaris v. Ohio Dept. of Commerce*, 11th Dist. Trumbull No. 95-T-5256, 1996 Ohio App. LEXIS 2001, *11-12 (May 17, 1996).

{¶ 85} This brings us to the second prima facie element under *Flynt*. "Absent some demonstration of an invidious motive, [a] court will not presume intentional or purposeful discrimination from a mere showing of different treatment." *State v. LaMar*,

29.

95 Ohio St.3d 181, 2002-Ohio-2128, 767 N.E.2d 166, ¶ 46.  We find no evidence of purposeful and intentional discrimination in this case.

{¶ 86} For example, the lower court cited "material misrepresentations" by the ODA as evidence of discriminatory animus.  According to the court, the misrepresentations were made during a hearing to decide the ODA's request for a search warrant.  That hearing occurred on January 28, 2015, before the Wood County Court of Common Pleas, albeit before a different judge.[3]

{¶ 87} In the instant matter, the court, acting sua sponte, filed the transcript from the warrant hearing.[4]  We have reviewed the transcript from the search warrant hearing.  We find that it is not evidence of discrimination by the agency toward Hetrick.

{¶ 88} The transcript is 18 pages in length.  Two witnesses spoke in favor of the search warrant:  the lawyer representing the ODA and the ODA enforcement agent.  The

---

[3] Following the hearing on the warrant, which was granted, the agency served it and the transfer order upon Hetrick and removed his DWA from his property.  Hetrick pursued immediate injunctive relief to stay the execution of the warrant and to have the DWA returned (*Hetrick v. Ohio Dept. of Agriculture*, Wood C.P. No. 2015CV0048).  The case was dismissed "as moot" by judgment entry dated January 5, 2017.

[4] The court filed the transcript on November 3, 2016.  The parties received notice that the transcript had been filed, and neither side objected.  Eighteen days after filing, on November 21, 2016, the court rendered its decision as to the permits.  The ODA now claims on appeal that the trial court erred in considering a transcript from another proceeding.  The ODA's failure to timely advise the trial court of its possible error, by objection or otherwise, operates as a waiver of the issue on appeal.  *Gallagher v. Cleveland Browns Football Co.*, 74 Ohio St.3d 427, 436-437, 659 N.E.2d 1232 (1996).

30.

lawyer repeated throughout the hearing that the statutory basis for the warrant was Hetrick's "non-permitted possession of [DWA]." More than once, the lawyer told the court that it was Hetrick's failure to obtain a permit that was the basis for the search warrant and not any regulatory violations regarding caging and care of the DWA. The court responded that it was "ignoring the caging and animal care concerns then." As to the lower court's concern that the enforcement officer described Hetrick as "uncooperative" and that his facility lacked adequate fencing, we find that those off-hand comments, in a hearing on a different matter, before a different judge, and said by a person who had no authority to decide the permit issue, are not evidence of invidious motives or bad faith.

{¶ 89} Similarly, we reject the lower court's characterization of the ODA's November 2014 on-site visit as a "scouting expedition" to justify "confiscating" Hetrick's DWA and/or that the ODA "materially distorted" its findings from that inspection. We reiterate our decision that the alleged caging and care violations may not serve as a basis to deny Hetrick's rescue facility permit. More importantly, however, the ODA did not need to gain entry to Hetrick's facility to justify the denial of the application or the transfer of his DWA. It had cause to do so, based upon Hetrick's illegal possession of non-permitted DWA, months after the deadline. We reject points three and four by the lower court as evidence of discrimination.

31.

**{¶ 90}** "'[A] defendant must demonstrate actual discrimination due to invidious motives or bad faith.'" *Cleveland v. Trzebuckowski*, 85 Ohio St.3d 524, 532, 709 N.E.2d 1148 (1999). In the absence of either, Hetrick's claim of selective enforcement fails as a matter of law. The ODA's second assignment of error is well-taken.

**{¶ 91}** For the reasons expressed herein, we reverse, in part, the judgment of the Wood County Court of Common Pleas in the rescue facility permit case (case No. WD-16-061). We reverse, in toto, the judgment of the lower court in the wildlife shelter permit case (case No. WD-16-062). With this decision, we reinstate the ODA's denial of both permits. Pursuant to App.R. 24, costs are assessed to the Hetrick.

                                                                    Judgments reversed.


A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.


Arlene Singer, J.                         _____
                                                          JUDGE
Thomas J. Osowik, J.

James D. Jensen, P.J.                     _____
CONCUR.                                                   JUDGE


                                          _____
                                                          JUDGE